SIXTH DIVISION

December 14, 2001

No. 1-00-1045

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County.

)

v. 
) Nos. 85 C 6555

) 85 C 7651

)

EARL HAWKINS and NATHSON FIELDS, ) The Honorable

) Vincent M. Gaughan,

Defendants-Appellees. ) Presiding Judge.

JUSTICE BUCKLEY delivered the opinion of the court:

In June 1985, defendants, Nathson Fields and Earl Hawkins, along with a codefendant, George Carter, were charged with the April 1984 murders of Jerome "Fuddy" Smith and Talman Hickman.  Carter's case was later severed and Fields and Hawkins were tried together.  Attorney Jack Smeeton represented Fields, and attorney William Swanno represented Hawkins.  Following a bench trial before Judge Thomas Maloney, defendants were convicted of murder and subsequently sentenced to death.  The complete facts as brought out in the original trial can be found in 
People v. Fields
, 135 Ill. 2d 18 (1990).  Our supreme court affirmed the convictions on direct appeal.  See 
People v. Fields
, 135 Ill. 2d 18 (1990).  The United States Supreme Court denied defendants' petitions for writ of 
 certiorari
 (
Fileds v. Illinois
, 498 U.S. 881, 112 L. Ed. 2d 182, 111 S. Ct. 127 (1990); 
Hawkins v. Illinois
, 498 U.S. 881, 112 L. Ed. 2d 182, 111 S. Ct. 227 (1990)) and their subsequent petitions for rehearing (
Fields v. Illinois
, 498 U.S. 994, 112 L. Ed. 2d 555, 111 S. Ct. 547 (1990); 
Hawkins v. Illinois
, 298 U.S. 995, 112 L. Ed. 2d 558, 111 S. Ct. 551 (1990)).

Thereafter, on April 16, 1993, Judge Maloney was found guilty by a federal jury for violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §1961 
et  seq. 
 (1994), conspiracy  to commit extortion, and obstruction of justice in connection with a scheme to fix cases in his courtroom, including this one.  During the course of the Hawkins/Fields trial, Maloney initially accepted a $10,000 bribe, only to return the money and convict defendants when he perceived (correctly) that the Federal Bureau of Investigation (FBI) had its eye on him.  In 1995, the Seventh Circuit affirmed his conviction.  See 
United States v. Maloney
, 71 F.3d 645 (7th
 Cir. 1995).

Fields and Hawkins filed amended postconviction petitions on September 8, 1992, and April 17, 1996, respectively, based in part on Maloney's corruption.  On September 18, 1996, Judge Deborah Dooling granted the petitions.  She found that defendants failed to receive a " 'fair trial before an impartial trier of fact' because Maloney had a 'direct, personal, substantial, pecuniary interest'"  in the outcome of the trial.  
People v. Hawkins
, 181 Ill. 2d 41, 49 (1998).  The State appealed Judge Dooling's ruling to the supreme court.  The Illinois Supreme Court concluded that Hawkins and Fields were entitled to a new trial and held that petitioners were denied their due process rights by the attempted bribe of the trial judge and that the violation of these rights entitled them to a new trial.  See 
People v. Hawkins
, 181 Ill. 2d 41 (1998).

On remand, prior to the new trial, numerous motions were filed by both sides.  On February 23, 2000, the trial court denied, as to both defendants, the State's motion 
in  limine
 to allow in evidence prior testimony of a deceased witness and the State's motion 
in  limine 
to admit bribery evidence.  The trial court also denied the State's motion to allow gang evidence as motive with respect to Fields and reserved ruling with respect to Hawkins.  On February 25, 2000, the State filed a certificate of substantial impairment and a notice of appeal pursuant to Supreme Court Rule 604(a)(1) (155 Ill. 2d R. 604(a)(1)).  The propriety of the three evidentiary rulings is now before us. 

I.  DISCUSSION

A.  Standard of Review

When the issue concerns the admissibility of evidence, as do all three issues before us, our standard of review is whether the trial court's decision amounted to an abuse of discretion.  See 
People v. Radovick
, 275 Ill. App. 3d 809, 817 (1995).

B.  Bribery Evidence

1.  Facts

Defendant Hawkins and his attorney, William Swanno, both testified on behalf of the United States in the federal trial of Judge Maloney.  See 
United States v. Maloney
, 71 F.3d 645 (7th
 Cir. 1995).  Their testimony, related to the bribery that occurred during the original trial of Hawkins and Fields, is set forth in relevant part herein and was corroborated by other evidence admitted at Maloney's trial.  

The evidence revealed that Hawkins' case was initially assigned to Judge Bailey; however, on July 1, 1985, a motion for substitution of judge, filed by Swanno, was granted and Hawkins' case was transferred to Judge Maloney.  After the State's motion for joinder was granted, Fields' case was transferred to Judge Maloney.

The testimony established that Swanno informed Hawkins that he had bribed Maloney in previous cases and that he told Hawkins he could win a decision in Hawkins' favor in a bench trial if Hawkins could raise enough money for the judge.  Hawkins, a member of the El Rukn gang, agreed to the scheme.  Hawkins referred Swanno to Alan Knox, a "senior" El Rukn leader, who approved the bribe and assured Swanno that the El Rukns would furnish the cash.

In January or February of 1986, Swanno met with Bob McGee, an attorney who acted as Maloney's intermediary for those wishing to bribe the judge, and informed McGee that he had a "hot case" in front of Maloney.  In a subsequent conversation, McGee and Swanno discussed a bribe and they arrived at a figure of $10,000.  According to Swanno, McGee talked with Maloney and confirmed the figure, but McGee told Swanno that the fix was conditional upon Swanno putting on a "a good case" so Judge Maloney would not look bad.  Swanno then informed the El Rukns that the bribe was on.

Surveillance records indicated that on the morning of trial, Swanno left court and went to the El Rukn headquarters to get the money.  Later that day, Knox arrived at the courthouse with the money.  Swanno confirmed the fix with McGee via telephone and later gave him a file folder containing the money.  

The case proceeded to a bench trial.  On June 17 and 18, the State put on its case where three eyewitnesses identified Hawkins as the murderer.  By this time, the FBI had become suspicious of Judge Maloney and the Hawkins/Fields case, and its agents were watching the trial closely.  This attention, coupled with the strength of the State's case, prompted Judge Maloney to have second thoughts.  On June 19, McGee called Swanno in to the anteroom outside Maloney's chambers to inform him that he needed to "give the books back that he had given him the other day" because the State's case was too strong.  Swanno told McGee to "hold onto the books" at least until the defense could put on its case.  

According to Hawkins' testimony, Swanno came back from the judge's chambers and told him that Judge Maloney had returned the bribe money.  Swanno testified, however, that he had in fact per-suaded McGee to talk to Judge Maloney about continuing the fix and was, at least temporarily, successful.  Swanno also testified that he confirmed the existence of the fix with Judge Maloney himself on two occasions.  Nevertheless, McGee called Swanno during the evening on the day the trial ended to inform him the fix was off.  The next morning Judge Maloney told Swanno that a lawyer had left a file for him in his chambers.  When Swanno went to the judge's chambers, Maloney handed Swanno the file of money he had passed to McGee at the start of the trial.  Hawkins and Fields were found guilty by the judge and subsequently sentenced to death.

2.  Admissibility

The State maintains that the trial court abused its discretion in denying the State's motion to admit the evidence of the bribery of Judge Maloney which had occurred during the Hawkins/Fields trial because such evidence is relevant and highly probative of the defendant's consciousness of guilt. 

Evidence of "other crimes" is inadmissible to establish a defendant's propensity to commit crimes; however, it may be admis-sible to show consciousness of guilt.  See 
People v. Bean
, 137 Ill. 2d 65, 107-08 (1990).  The trial court's decision to admit evidence of other crimes is discretionary and shall not be reversed absent an abuse of discretion.  See 
People v. Kliner
, 185 Ill. 2d 81, 146 (1998).

The State cites one case in which a defendant attempted to bribe the trier of fact as support for its assertion that the trial court herein abused its discretion in refusing to admit the evidence offered by the State.  In 
People v. Aleman
, 313 Ill. App. 3d 51 (2000), the defendant paid a $10,000 bribe to Judge Wilson in exchange for an acquittal on a murder charge.  
Aleman
, 313 Ill. App. 3d at 56.  Following a bench trial, Judge Wilson acquitted Aleman.  See 
Aleman
, 313 Ill. App. 3d at 57.  Years later when the bribery was discovered, Aleman was reindicted for the murder.  
Aleman
, 313 Ill. App. 3d at 53 n.1.  During a jury trial, the State introduced evidence of the bribery to show consciousness of guilt.  See 
Aleman
, 313 Ill. App. 3d at 55-57.  Defendant was found guilty.   On appeal, defendant argued that he was denied a fair trial by the admission of the "other crimes" evidence because its admission resulted in a minitrial on the issue.  Defendant also asserted that the evidence had "attenuated probative value" because the bribe was orchestrated by third parties rather than defendant.  
Aleman
, 313 Ill. App. 3d at 65.  This court disagreed.  We held that the bribery testimony "although prejudicial, was clearly probative and relevant to show defendant's consciousness of guilt."  See 
Aleman
, 313 Ill. App. 3d at 64.  We noted that the trial court carefully limited the evidence of the bribery and instructed the jury on at least two occasions that the purpose of admitting the bribery evidence related only to defendant's consciousness of guilt.  See 
Aleman
, 313 Ill. App. 3d at 65.   We further noted that the testi-mony "explicated the delay in bringing defendant to trial almost 25 years after the offense; explained defendant's initial acquittal; and ineluctably revealed defendant's consciousness of guilt."  See 
Aleman
, 313 Ill. App. 3d at 64.

a.  Admissibility as to Hawkins

Thus, the question presented is whether the evidence of the bribery of Judge Maloney is sufficiently probative and relevant to demonstrate defendants' consciousness of guilt such that it out-weighs the prejudicial effect of its admission.  We find that with respect to Hawkins, the answer to this question is yes.

First, the evidence of the bribe of Judge Maloney is strong and overwhelming.  Maloney was convicted in federal court of taking bribes and the conviction was affirmed on appeal.  See 
United States v. Maloney
, 71 F.3d 645 (7th
 Cir. 1995).  Second, Swanno testified that he bribed Maloney in this case and Hawkins participated in the scheme.  

We reject Hawkins' assertion that "the evidence is ambiguous on consciousness of guilt."  Hawkins contends that this case is distinguishable from 
Aleman
 because, unlike Aleman, he did not seek out a weak judge.  Hawkins relies on the distinguishing fact that it was Swanno, a "crooked attorney," who had previously conspired with "the crooked judge," who had pressed the idea.  That may be true; however, Hawkins cannot escape the fact that he not only agreed to the idea, but he also provided Swanno with the El Rukn contact who arranged for Hawkins' gang to pay the bribe.  Indeed, Hawkins and Swanno had several conversations regarding the bribe.  Hawkins was unequivocally a willing participant in the bribe.

Hawkins also argues that the probative value is weak because "it cannot be said that the 
only
 reason one would have succumbed to Maloney's extortion was a guilty conscience *** an innocent person would likely fear a wrongful conviction if they did not pay Maloney or be convicted."  (Emphasis added.)  This argument overlooks the fact that Hawkins always had the option of taking a jury trial if he feared a wrongful conviction because he did not pay the judge.  In any event, Hawkins is free to make this argument to the trier of fact.

Finally, Hawkins argues that the evidence should not be admitted because it will result in a minitrial of a collateral offense.  We reject this argument for the same reasons we rejected it in 
Aleman
.  See 
Aleman
, 313 Ill. App. 3d at 65.

Accordingly, we find that the trial court abused its discretion in denying the State's motion to admit bribery evidence as it relates to defendant Hawkins.

b.  Admissibility as to Fields

Once again, the question is whether the evidence of the bribery of Judge Maloney is sufficiently probative and relevant to demonstrate defendants' consciousness of guilt such that it outweighs the prejudicial effect of its admission.  We find that with respect to Fields, the answer to this question is no.

The evidence with respect to Fields' involvement in the bribe is tenuous at best.  The testimony provided by Swanno at Maloney's federal trial revealed that Swanno had no actual knowledge that Fields had any involvement in the bribery scheme.  Although the State contends that Fields was present in lockup when Hawkins spoke with Swanno regarding the bribe, as the trial court noted, Fields' presence was legally mandated by the charges against him.  In addition, Swanno's testimony does not indicate that Fields was a participant in, or aware of, any conversations between Swanno and Hawkins about the bribe.  Also, both Fields and his attorney, Jack Smeeton, filed affidavits in the postconviction case attesting that they had no knowledge of the bribe until after the trial.  See 
Hawkins
, 181 Ill. 2d at 62.

Accordingly, we find that because the evidence of Fields' participation in the bribe is weak, it is insufficient to outweigh the extreme prejudicial effect of the admission of the bribery evidence.

C.  Gang Evidence

The State maintains that the trial court's decision to exclude gang evidence was an abuse of discretion since it "clearly was the motive for this crime."  Although the trial court ruled that the gang evidence was inadmissible as to Fields, it expressly reserved ruling on the issue with respect to Hawkins.  Because it is well settled that we do not have the authority to consider a matter not passed on by the trial judge (
Trisko v. Vignola Furniture Co.
, 12 Ill. App. 3d 1030, 1034 (1973)), we will only consider the issue as to Fields, not as to Hawkins.   

1.  Facts

The majority of the State's motion to admit gang evidence is dedicated to evidence as it relates to Hawkins.  For the reasons already stated, such evidence is not relevant here and will not be addressed.  Thus, we will address the following evidence as it pertains solely to Fields.  

Both victims, Jerome "Fuddy" Smith and Talman Hickman, were members of the Black Gangster Disciples, and Jerome Smith was the leader of the "Goon Squad" section of the gang.  Fields was an admitted member of the El Rukns.  The State seeks to establish, via testimony from a gang crimes specialist, that as of April 1984, the two gangs were at war with each other over the sale of narcotics in the area of the homicide.  The El Rukn headquarters, commonly called "The Fort," was located a few blocks away from the murders.  Although Fields denied committing this offense, he admitted to the detectives investigating this case that he held the rank of "ambassador" in the El Rukns and was hoping to rise in the organization.  Fields knew that two members of the El Rukns had been shot previously by members of the Goon Squad of the Black Gangster Disciples.  Fields also knew that Jerome Smith was a member of the Black Gangster Disciples.

2.  Admissibility

The trial court found that the State had failed to establish "an adequate nexus" between the gang evidence and Fields.  We disagree.

Evidence indicating that Fields was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act.  
People v. Smith
, 141 Ill. 2d 40, 58 (1990).  However, such evidence is only admissible where there is sufficient proof that such membership or activity is related to the crime charged.  
Smith
, 141 Ill. 2d at 58.  

With respect to proving motive, the law in Illinois is as follows.  Although the State has no obligation to prove motive, the State may introduce evidence which tends to show that an accused had a motive for killing the deceased.  
Smith
, 141 Ill. 2d at 56.  Any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased.  
Smith
, 141 Ill. 2d at 56.  In order for such evidence to be competent, it must, at least to a slight degree, tend to establish the existence of the motive relied upon or alleged.  
Smith
, 141 Ill. 2d at 56.  "Thus, when the State undertakes to prove facts which the State asserts constitute a motive for the crime charged, it must be shown that the accused knew of those facts.  [Citations.]" 
Smith
, 141 Ill. 2d at 56.  It is the function of the trial court to weigh the probative value and the prejudicial effect of evidence in determining whether it should be admitted, and evidentiary rulings of this nature will not be overturned, absent a clear abuse of discretion.  
People v. Joya
, 319 Ill. App. 3d 370, 375-76 (2001).

Fields relies primarily on the cases of 
People v. Smith
, 141 Ill. 2d 40 (1990), and 
People v. Easley
, 148 Ill. 2d 281 (1992), to support its assertion that the trial court properly denied admis-sion of gang evidence.  We find that both cases are distinguish-able from the case at bar.

First, in 
Smith
, the victim was an assistant warden at the Pontiac Correctional Center.  As proof of motive, the trial court allowed the State to elicit testimony from another assistant warden which indicated that the victim had had an altercation with the leader of the gang to which Smith allegedly belonged, there was gang activity in the prison, and the victim was a strict discipli-narian who refused to tolerate any gang-related activity.  
Smith
, 141 Ill. 2d at 52.  The supreme court held that the gang-related evidence might have been probative of whether Smith had a motive to kill the warden if it had somehow been tied to Smith.  
Smith
, 141 Ill. 2d at 58-59.  However, the evidence only indicated that Smith had been seen in an apartment on one occasion with the leader of the King Cobras, Smith was talking with the gang leader at the time of his arrest, and the gang leader was influential in the neighbor-hood.  
Smith
, 141 Ill. 2d at 59.  The court held that this evi-dence, by itself, could not support a reasonable inference that Smith was an active member of the King Cobras or that he was acting pursuant to the alleged orders of the gang leader.  
Smith
, 141 Ill. 2d at 59.  The court further found that there was no evidence to suggest that Smith knew that the victim was an assis-tant warden, was tough on gangs, or had an altercation in prison with the gang's leader.  
Smith
, 141 Ill. 2d at 59.  The court concluded that the gang-related evidence was of little probative value, stating that "[i]t goes too far to suggest that every person somehow associated with [the leader of the King Cobras] is a member of the King Cobras, and thereby subject to the will of [the gang leader] and shares a common design or purpose with the gang."  
Smith
, 141 Ill. 2d at 60.

In 
Easley
, the victim was a superintendent at the Pontiac Correctional Center.  The State sought to prove that the victim's murder was carried out by the Black Gangster Disciples in retalia-tion for the death of one of its members.  The State introduced evidence of the existence of gangs at Pontiac and defendant's status as a Black Gangster Disciple member.  On appeal, the supreme court found that introduction of the gang evidence was improper because the State failed to introduce any evidence to establish the existence of a Black Gangster Disciple conspiracy to kill a Pontiac staff member and, more importantly, failed to establish defendant's knowledge of any conspiracy.  
Easley
, 148 Ill. 2d at 328-29.

Here, unlike in 
Smith
 and 
Easley
, there is evidence indicating that Fields belonged to the El Rukns.  In addition, the evidence established, at least to a slight degree, that Fields had a motive to kill the victims.  In July of 1985, Fields told the Chicago police that he was a member of the El Rukns and held the rank of "ambassador."  Fields also stated that he knew the victim, Jerome "Fuddy" Smith, and when asked about the motive for the murders he stated that "he did not know for sure, but that two members of the El Rukns had been shot by members of the Goon Squad of the Disciples."  As the State asserts, the fact that Fields had know-ledge that Jerome "Fuddy" Smith was a rival gang member and knew that Smith's gang shot two members of Fields' gang shows at least to a slight degree that there was motive for Fields to kill the victim.  This is very different from 
Smith
, where there was no evidence that Smith was a member of the gang, knew that the victim was a warden, knew that the victim was tough on gangs, or knew that the victim had had an altercation with the gang leader.  This case is also very different from 
Easley
, where the only testimony establishing defendant's status as a gang member came from the prison wardens and where there was no evidence to establish a motive for the murder much less defendant's knowledge of it.

Accordingly, because the gang evidence establishes Fields' membership in the El Rukns and establishes, at least to a slight degree, the existence of a motive, under the standard set forth in 
Smith
, we find that the trial court abused its discretion in denying the State's motion to admit the gang evidence relevant to Fields.

D.  Admission of Prior Testimony of Deceased Witness

1.  Prior Testimony

Richard Buckles, now deceased, testified for the State in the original trial.  Buckles testified that he was standing at the corner of 39th
  Street and Langley, across the street from the Ida B. Wells housing complex, at the time the shooting occurred.  He testified that he saw two black men, one tall, light skinned, wear-ing a red jacket and blue pants and a ski mask, and the other shorter, bigger, dark skinned, and wearing blue pants, a blue shirt and a ski mask.  He stated that the men shot Talman Hickman several times and shot Jerome Smith twice. The men then pulled up their ski masks and looked around.  He testified that he immediately recog-nized defendant Hawkins, whom he knew as "Monsieur," because he had seen him at the Ida B. Wells complex.  He testified that the two men then ran to a large blue car parked on Langley Avenue with their masks off, threw their guns in the car, jumped in the car and drove away.  Buckles testified that he was approximately 25 feet away from the victims at the time of the shooting.  Buckles testi-fied that he lived in the Ida B. Wells complex at the time of the shooting and was a member of the Goon Squad.  He testified that he first spoke to the police two years after the shooting, after he moved from the complex.  He testified that he had never viewed photo displays or a lineup involving the defendants.  At the trial, he positively identified Hawkins as one of the gunmen, but could not be sure if Fields was the other gunman.

2.  Admissibility

As noted in our supreme court's 
People v. Rice
, 166 Ill. 2d 35 (1995), decision:

"It is well settled that the testimony of a witness at a prior hearing is admissible in evidence at trial where the witness is una-vailable and when ample opportunity to cross- examine existed at the prior hearing. [Citations.] *** [D]etermining whether ample opportunity to cross-examine at the prior hearing exists does not lend itself to a 
per se
 determination, but must be decided on the circumstances of each case.  [Citation.]"   
Rice
, 166 Ill. 2d at 39.

In addition, "[f]or an opportunity to cross-examine to be considered meaningful, and therefore adequate and effective, the motive and focus of the cross-examination at the time of the initial proceeding must be the same or similar to that which guides the cross-examination during the subsequent proceeding."  
People v. Rice
, 166 Ill. 2d at 41.

We find that the trial court abused its discretion in denying the State's motion to admit the testimony of Richard Buckles.  First, it is undisputed that Buckles is unavailable to testify.  Second, the motive and focus of the cross-examination at the time of the initial proceeding are exactly the same as they are today, 
i.e.
, the guilt or innocence of Fields and Hawkins.  At the previous trial, the cross-examination of Buckles probed his credibility, bias, length of association with one of the victims, gang membership, opportunity to observe, ability to recollect, and failure to come forward for over two years.  Nevertheless, Hawkins and Fields contend for a variety of reasons that the testimony should be excluded.  We will address each in turn.

Hawkins contends that Buckles' testimony should not be admitted because Judge Maloney improperly interfered with the testimony out of consideration for his own interests.  For example, Hawkins asserts that Maloney required Buckles to clarify and repeat damaging testimony and in support cites the following exchanges.  First:

"Q. How old is James Langston?

A..  How old is he?

Q. Is he about your age or is he an infant

A.   I don't know.

Q.   You said you know him, right?

A.   Yes, I do.

Q.   Is he as big as you are physically?

A.   No.

Q.   How much taller is he than you?

A.   He is smaller than me.

Q.   Is he a teenager or is he five years old?

A.   Teenager.

THE COURT: Which Langston is this?

MR. SMEETON: This is James, James Langston.

THE COURT: You said you knew one of them?

THE WITNESS: I know all of them."

The second exchange went as follows:

"Q. You were a long ways from the corner where you were standing to where Tom and Fuddy were, weren't you?

A.  No.

Q.  About how far was it from where you were standing on the corner to that breezeway?

A.  I don't know how close it was.

THE COURT: Will you indicate here in the courtroom about how far it was?

THE WITNESS: Yes, I can.

THE COURT: About how far would you say?

THE WITNESS: It is as far as I am.

THE COURT: Wait.  Can you say?

THE WITNESS: Right there to where that bench at.

MR. SMEETON: To right here or the second one?

THE COURT: Indicating a distance of about 25 feet."

The third exchange cited by Hawkins took place as follows:

"Q. Do you remember telling those two police officers, in April of '86, that after the shooting both of the men ran in your direction towards the car?

A. That is my direction, ain't it, running straight pass me?

THE COURT: So, you did say that.

MR. SMEETON: They ran in your direction?

A.  Yes.  They ran straight pass me."

The fourth exchange took place as follows:

"Q.  You were 25 feet away from these men when they did the shooting.  How far away were you from these men at the time that they ran to their car?

A.  I don't know.

Q.  Well, would it be as far as from me to you?

A. Yes, it could be.

Q. About ten, fifteen feet?

THE COURT: That's right."

And finally, the fifth exchange that Hawkins' relies on to support his assertion that Judge Maloney interfered with Buckles' testimony took place as follows:

"Q.  When you were standing 25 feet away, was that person too far away from you to be able to really get a good look at his face?

MR. RUECKERT: Objection.

THE COURT: Sustained."

We find that none of the above exchanges support Hawkins' argument.  In the first exchange, Judge Maloney was clarifying which of the Langston brothers the witness was referring to.  In the second exchange, the judge was making a record of the distance to which Buckles testified.  In the third exchange, the witness made a sarcastic response and the judge was attempting to make a record of Buckles' answer.  In the fourth exchange, the judge acknowledged the attorney's approximation for the record.  And finally, in the fifth instance, the judge did not "interfere" but properly sustained an objection.

Hawkins also argues that Judge Maloney improperly blocked inquiry during Fields' attorney's questioning of Buckles about the police questioning that led to Buckles' identification of defendants and cites the following:

"Q.  What did Castle and Richardson say to you when they came to your house that night, in April of '86?

MR. RUECKERT: Objection, Judge; it's hearsay.

THE COURT: Sustained.

Q. Did the police officers bring any photographs to you?

A.  No.

Q.  Did they ask you what happened on the night of April 28th?

A.  No.

Q.  Well, did they ask you if you had seen the shooting that night?

A.  No.

Q.  They didn't ask you that?

A.  No.

Q.  Well, what did the police ask you when they came to see you two years after this homicide?

MR. WHARRIE: Objection.

THE COURT: Sustained."

Hawkins asserts that the above testimony was particularly relevant to Buckles' reliability because he did not first speak with the police until nearly two years after the murders had occurred.  That may be true; however, Judge Maloney properly sustained objections to the above questions because they called for inadmissible hearsay answers.  

Fields claims, without any citation to the record, that "[a]lthough it was crucial in assessing Buckles' testimony to know what police officers had told him, or shown him, to induce him to finally come forward two years after the event, this was precisely the area in which the judge blocked all inquiry."  A review of the record, including the portions already cited to by Hawkins, demonstrates this was not the case.  The circumstances surrounding Buckles' initial contact with the police were revealed during his cross-examination.  For example:

"Q.  After you got done looking at Fuddy and Talman, where did you go then?

A.  I ran in the house.

Q.  You ran in the house?

A.  Yes.

Q.  Did you call the police?

A.  No.

Q.  Did you hear the sirens of all the police cars coming?

A.  Yes.

Q.  Did you ever look out the window or go outside and see the crowds of police that had come to the scene?

A.  No.

Q.  Did you ever go back out to the scene after you heard the sirens and talk to the police?

A.  No.

Q.  Well, did you call the police later that night?

A.  No.

Q.  Did you talk to any of the Langston brothers that night?

A.  No.

Q.  Did you call the police the next day?

A.  No.

Q.  How about the day after that?

A.  No.  I ain't never called the police.

Q. You didn't tell talk to the police until about two months ago for the first time, did you?

A. Yes.

Q. And that's about two years since the shooting, isn't that right?

A. Yes.

Q.  And how did you happen to talk to the police for the first time, two years after you saw your friends get killed?

A.  I don't know.  They just found me.

Q.  They found you.  Where did they find you, Richard?

A.  They found me at home.

Q.  Do you remember who it was that came to see you?

A.  Yes, I do.

Q.  Who?

A.  Sergeant Richardson and Castle.

Q.  They are from gang crimes?

A.  Yes.

Q.  How do you know their names so well?  You met them before?

A.  No.

Q.  How do you know their names?

A.  I met them when they came and got me.

Q.  Had you seen them since then, since the first time you talked to them?

A.  Yes.

Q.  How many times did you see them?

A.  About several.

Q.  About several?

A.  Yes.

Q. Was that two or three or was that close to ten times?

A.  About seven.

Q.  What did Castle and Richardson say to you when they came to your house that night, in April of '86.

MR. RUECKERT: Objection, Judge; it's hearsay.

THE COURT: Sustained.

Q. Did the police officers bring any photographs to you?

A.  No.

Q.  Did they ask you what happened on the night of April 28th?

A.  No.

Q.  Well, did they ask you if you had seen the shooting that night?

A.  No.

Q.  They didn't ask you that?

A.  No.

Q.  Well, what did the police ask you when they came to see you two years after this homicide?

MR. WHARRIE: Objection.

THE COURT: Sustained.

Q.  Well, when the police showed up at the door, did they tell you what they were there for?

A.  No.

Q.  Well, when the police showed up at the door, who initiated discussion about the homicide that you had seen two years earlier?

A.  Didn't nobody say nothing about it.  They just said, 'We want to talk to you about a homicide.'

Q.  So, they asked you about a homicide?

A.  Yes.

Q.  And did you tell them what you knew about it?

A.  Yes.

Q.  And did you tell them everything that you knew about this?

A.  Yes."

A review of the testimony demonstrates that the nature of his initial contact with the police was thoroughly examined.  Judge Maloney did not improperly block any testimony in this regard.

Fields also argues that Buckles' testimony that police officers did not show him any photographs and did not have him view any lineups is highly unlikely.  That may be so; however, that was the testimony given.

Hawkins also claims that "lack of cross-examination by Hawkins' attorney could send the message to a jury on retrial that Hawkins counsel felt the testimony could not be refuted" and, further, that he would have to offer an explanation of why no cross-examination exists on his behalf.  That is not true.  Hawkins' attorney adopted Fields' attorney's cross-examination as his own.  When read to the jury, the jury need not know who conducted the examination and need not know that Hawkins' attorney never posed any questions.

Finally, Hawkins contends that the State has been unable to produce any of the exhibits used by Buckles' in the first trial thereby rendering his testimony highly confusing.  The State asserts that it has all of the photographs that were marked and used as exhibits but does not have a diagram that was used.  Accordingly, we find that any testimony which relates to any exhibits not available on remand, if determined to be confusing by the trial judge, shall be redacted.

Based on the above, we find that the trial court erred in denying the State's motion 
in  limine
 to admit the prior testimony of deceased witness Richard Buckles.

II.  CONCLUSION

Accordingly, we hereby reverse the trial court's order denying admission of the bribery evidence as to Hawkins but affirm the order as to Fields; we reverse the trial court's order denying admission of gang evidence as to Fields; and, we reverse the trial court's order denying admission of the prior testimony of deceased witness Richard Buckles.

Affirmed in part and reversed in part; cause remanded.

Gallagher, P.J., and O'Brien, J., concur.