FIRST DIVISION

June 20, 2005

Nos.1-01-4145 & 1-02-0021, Consolidated

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

TROY BINION and PATRICK JONES,

Defendants-Appellants.

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court

of Cook County

Nos. 98 CR 25034 &

       98 CR 29589

Honorable

Stuart E. Palmer,

Judge Presiding.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Following separate, simultaneous jury trials, defendants Troy Binion and Patrick Jones were convicted of the first degree murder (720 ILCS 5/9-1(a)(1) (West 1998)) of Brian Thomas and the attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 1998)) of Antonio McGee.  Binion was convicted on an accountability theory and sentenced to concurrent prison terms of 30 years for first degree murder and 20 years for attempted murder.  Jones was sentenced to concurrent prison terms of 40 years for first degree murder and 20 years for attempted murder.  Defendants filed separate appeals which this court consolidated on the State's motion.  We affirm.

On August 28, 1998, McGee was driving his black Oldsmobile Delta 88 automobile near 64th Street and Vernon Avenue in Chicago when he saw defendant Jones with a handgun, running from an alley and firing shots at the car.  McGee's passenger and friend, Thomas, was shot in the head.  McGee drove Thomas to the hospital.  Thomas died the next day.  Chicago police detective Steven Lazzara interviewed Mario Coleman, defendants' friend and fellow Black Disciples street gang member.  Coleman implicated defendants to Lazzara and Assistant State's Attorney Steven Rosenblum.  

The police arrested Binion on August 30, 1998.  Binion gave a statement to Assistant State's Attorney Konstantinos Markakos, inculpating himself and Jones.  The police arrested Jones on October 20, 1998.  Jones agreed to give a statement to Assistant State's Attorney Brendan McGuire, but after making several inculpatory comments, Jones exercised his right to counsel.

Defendants filed motions to suppress their statements.  They claimed their statements were obtained by illegal means, including physical and mental coercion and material misrepresentations of fact by the police.  The trial court held a hearing, then denied the motions.

Defendants' simultaneous trials began on February 14, 2001.  McGee testified that at about 1:30 p.m. on August 28, 1998,  he was driving near 64th Street and Eberhart Avenue.  Thomas was a passenger.  As McGee turned south on Vernon Avenue, he saw a man run from an alley and fire a gun in the direction of the car.  When McGee saw that Thomas had been shot, he drove to the hospital, where Thomas later died.  About two months later, McGee identified Jones in a lineup as the gunman.  McGee also identified Jones in court.  McGee testified that he glimpsed a second man in the alley as Jones approached the car, but McGee could not identify anyone in court as the man in the alley.  On cross-examination, McGee admitted having four earlier convictions and being a former member of the Gangster Disciples street gang.  

Coleman testified on February 15, 2001.  He appeared as a State witness after being arrested and held for contempt of court for failing to appear in court under a subpoena.  Coleman testified that he, Jones and Binion were friends and members of the Black Disciples street gang.  Coleman said he was still a gang member at the time of the trial.  On direct examination by Assistant State's Attorney Robert Heilingoetter, Coleman testified:

"Q.  [D]id the police *** come to your residence *** on August 29, 1998 *** ?

* * *

A. Yes.

* * *

Q.  Did the detective *** ask you if you would accompany him back to Area 2 in regards to a shooting that had occurred 3 days prior?

A.  He ain't say nothing about a shooting.  He just said I had to come with him.

* * *

Q.  And *** did you tell the detective what you knew about that shooting?

A.  No, I ain't tell him because I ain't know.

Q.  So you didn't tell him anything at that time?

A.  I told him what he wanted to hear.  What he told me--. 

* * *

Q. *** [You told Assistant State's Attorney Rosenblum] *** that you were in your apartment *** [when] you heard 4 to 6 gunshots, isn't that correct?

A.  Yes.

* * *

Q.  You also told the Assistant State's Attorney *** that you actually left your apartment *** when you observed your fellow gang members Troy Binion and Patrick Jones, correct?

A.  Yes.  But ain't no truth to that.

Q.  *** I'm asking you about what you told the Assistant State's Attorney.

A.  Well, yes.

Q.  You told that to the Assistant State's Attorney, correct?

A.  Yeah.  The police wanted to hear.

* * *

Q.  And after [Rosenblum] prepared [a] handwritten statement [summarizing what you had just told him], you had an opportunity to review that entire statement, didn't you?

A.  Yeah.

Q.  And *** you in fact did read every word of that, correct?

A.  Just looked through.  Just glanced through it.

* * *

Q.  Well, while you were glancing through it, you actually made some corrections to that statement too, didn't you?

A.  Some ones he said needed to be made.

* * *

Q. Did you ever tell the Assistant State's Attorney that [the handwritten statement] isn't really what you knew about this incident?

A. Didn't have a chance.

* * *

Q. ***  You're telling us today that this isn't really your statement, but that *** someone else told you to say this?

A. Yeah.

Q.  Who are you saying told you to say this?

A.  This is what the detective wanted to hear."

Coleman was then cross-examined by Raymond Prusak, counsel for Binion.  No reference to a polygraph exam had yet found its way into the record.  Coleman testified:

"Q [Prusak].  You didn't volunteer to go ***  to the police station, did you?

A.  No.

* * *

***  They said I had to.

Q.  All right.  Now, when did they tell you that you were in deep s---?

A.  They told me that if I didn't say what they said [to say,] they would see to it that I would be in deep s---."

Coleman then testified that he was subjected to a polygraph examination:

"Q.  ***  So after you signed the statement, made all the corrections, they let you go home, is that right?

A.  No.

Q.  Where did they take you then?

A. *** [To a] lie detector test.  That's where I went next."

No objection was made to strike this answer at the time it was made.  On redirect examination by Heilingoetter, Coleman gave additional testimony about the polygraph examination:

"Q.  The first day you were [at the police station] on [August] 29th, the police asked you what you knew about this and you told them this statement about Troy and Patrick, correct?

A.  That was the next day.

Q.  Well, isn't it true, sir, that after you gave them that statement the first day you were in on the 29th, that they said to you that they wanted to take you for a lie detector test?

A.  They said I had to.

MR. HEASTON [Jones' attorney]: Objection, Judge.

THE WITNESS:  They said I had to go for a lie detector.

* * *

THE COURT:  Objection overruled.

MR. HEILINGOETTER:

Q.  Sir, after you spoke to the police on the first day that you were picked up, the 29th, the police told you or they asked you whether or not you would be taken to a polygraph, is that correct?

A.  Told me I had to go.

* * *

Q.  Okay.  So it's your testimony that you spoke to the police on the 29th.  ***   That you gave this handwritten statement to the Assistant State's Attorney on the 30th.  That after you signed the handwritten statement ***, that then you were taken to the lie detector?

A.  Yeah. ***

Q.  Okay.  So after the summary was made on the 30th, you were taken to the lie detector and the lie detector was at 11th and State, correct?

A.  Correct.

Q.  And after you were taken to the lie detector ***, they brought you home?

* * *

A. Yeah.  After that they let me go.

Q.  It's your testimony that they made you sign a statement full of things that were not true.  And then after they made you sign a statement of what they told you to say, that they took the time out to take you to a lie detector then?

A.  Yes."

At the conclusion of Coleman's testimony, the trial court admonished the jury:

 "You just heard some testimony concerning this witness's trip to take a lie detector test, okay.  Now, the results of a lie detector test are not admissible in evidence.  And I don't want you to try to surmise what the [result] of that lie detector was one way or the other.  The only reason that you are hearing testimony concerning Mr. Coleman going to the lie detector test was to place that trip chronologically within the course of the police investigation.  And you're to consider it for that purpose only.

I'm specifically instructing you not to attempt to surmise what the results of that lie detector test was, okay."

Before the proceedings reconvened before the jury on February 16, 2001, defense counsel again raised the issue of the polygraph evidence:

"MR. PRUSAK:  *** I'd like to make a motion for mistrial based upon the polygraph lie detector evidence that came in yesterday.  It was unsolicited.  And the [S]tate expounded on it during *** the redirect of their own witness.  I feel it prejudiced the jury and they will have that in the back of their minds when they are making a [decision].

***

MR. HEASTON: I'm joining in the motion for mistrial on behalf of Patrick Jones.  

* * *

THE COURT: I think that the fact that [the polygraph evidence] came out during one of the cross examinations is not in and of itself determinative of this issue. ***  But I think what's determinative of the issue is what I said yesterday.  It does not make sense that Mr. Coleman would be threatened by the police to make certain statements and then take a lie detector test. ***  Why would the police force someone to make a statement and then take him to the detector to find out if he was telling the truth or not.  The only reason why that was allowed in is *** because it is inconsistent with logic.  And I explained that to the jury."

The trial court denied defendants' motions for a mistrial.  

 Detective Lazzara testified after Coleman.  Lazzara said Coleman voluntarily accompanied officers to the police station for an interview on August 29, 1998.  Lazzara testified that Coleman said that on the previous afternoon, Coleman was inside his apartment at Parkway Gardens when he heard gunfire.  Coleman went outside where he encountered defendants, whom he knew as Troy (Binion) and "Snap" (Jones).  Defendants told Coleman they had "aired out" (fired shots at) a black car that had been driving around the neighborhood.  Lazzara denied threatening Coleman.  Lazzara's testimony on the timing of the polygraph examination differed from Coleman's:

"MR. HEILINGOETTER:

Q.  Now, it's your testimony, Detective, that this statement [inculpating defendants] that Mario Coleman gave to you was your first conversation with him after you brought him back to the area on August 29th, 1998, is that correct?

A.  Yes, it is.

Q.  After he made this statement to you, could you tell us what you did next by way of investigating this incident?

A.  We asked Mr. Coleman if he would submit to a polygraph examination to [validate] his account of what happened.

* * *

Q.  Did [Coleman] still agree to go to the polygraph examination?

A.  Yes, he did.

* * *

Q.  Where was he taken?

A.  He was taken to 11th and State, Police Headquarters.

MR. PRUSAK: Objection again.

***  [The following proceedings were held outside the presence and hearing of the jury.]

MR. PRUSAK: Your Honor, *** at this point, it's going to be pretty obvious that [Lazzara] took [Coleman] to the polygraph exam and [the police] went on out and arrested the other 2 guys.  So even though [Lazzara is] not going to say the results [of the polygraph], [the jury is] going to know what the results are.  This is highly prejudicial.  Making another motion for mistrial.  I think you should limit him at this point how far he can go with this.  ***

* * *

THE COURT: *** Detective, *** I'm instructing you I want you to be careful not to let [the polygraph results] slip out, okay?

THE WITNESS: Okay, Judge.

THE COURT: ***  I don't want anything about the results of the exam or because of the exam you did this or that or the other thing.  But I'm going to remind [the jury] it's limited evidence.

* * *

[Proceedings were then held in the presence of the jury.]

* * *

"THE COURT: Ladies and gentlemen, you may remember I told you the other day the evidence concerning Mr. Coleman going to the polygraph examiner was admitted to be considered by you only for the limited purpose of explaining to you the course in chronology of the police investigation.  ***

MR. HEILINGOETTER:

* * *

Q.  Could you tell us what you did by way of pursuing this investigation after you arrived back at [A]rea 2?

A.  We contacted the State's Attorney's Office.

* * *

Q.  And did [Assistant State's Attorney Rosenblum] arrive at Area 2 sometime at approximately noon on *** August 30, 1998?

A.  Yes, he did.

* * *

Q.  *** [D]id you have occasion to be present as Assistant State's Attorney Rosenblum spoke with Mario Coleman?

A. Yes, I did.

* * *

Q.  And [did Coleman make] substantially the same statement he made to you the prior day on August 29th?

A.  Yes, it was.

* * *

Q.  After the statement was prepared by *** Rosenblum and the corrections were made and that was signed by all of the parties, what was done with Mario Coleman?

A.  He was then taken home."

 Lazzara also testified that as part of his investigation, he checked computer records to learn the identities of “Snap” and Troy and he located "I-Cam" photographs of defendants.  Lazzara explained that the I-Cam system is used by the police to find records and photographs of people arrested previously.  

 Assistant State's Attorney Rosenblum testified that he wrote out Coleman's statement and made corrections after reviewing it with Coleman.  Coleman, Rosenblum and Lazzara all signed the pages of and corrections to the document.  Coleman also identified and signed photographs of defendants which Rosenblum attached to the written statement. 

The parties stipulated that, if called, Assistant State's Attorney Paul Bervid would testify that Coleman implicated defendants before the grand jury on August 31, 1998.  The grand jury transcript was published to the jury.  

Officer Marshall Mason testified that he apprehended Binion on August 30, 1998, after Binion fled from the police.  

Assistant State's Attorney Markakos testified that he interviewed Binion in the presence of Lazzara.  Binion agreed to have Markakos prepare a handwritten statement.  Binion made and initialed changes and signed each page of the statement.  Binion's statement implicated Jones as the gunman who shot a 9-millimeter handgun at McGee's black Delta 88.  Binion told Markakos  he was serving as Jones' lookout.  After the shooting, defendants ran to a playground in Parkway Gardens where they encountered Mario Coleman.  Markakos testified that Binion said Jones told Coleman that Jones had shot someone.  Binion said he thought Jones hid the gun after the shooting.  Binion's statement was published to the jury and included the following: "Troy states that he, Troy, agreed to go with Snap to 'get that n----- in the black Delta.'  Troy states that by 'get' he, Troy, understood that to mean that Snap was going to try to kill the person in the black Delta car."

Binion's testimony contradicted Markakos' testimony.  Binion testified he did not shoot anyone, did not know who shot someone and did not see anyone get shot.  Binion said he was with Jones and Coleman on August 28, 1998, but he did not know if Jones had a gun.  When Jones asked Binion to be a lookout, Binion thought Jones was going to make a narcotics sale.  Binion and Jones walked to the vicinity of 64th Street and King Drive, as Binion "watched Jones' back."  Binion then heard gunshots, but he did not know their source.  He then fled to his home at 6410 South King Drive.  Binion testified that after his arrest, Lazzara slapped and punched his face and body and handcuffed him to a wall.  Lazzara promised to help Binion if he cooperated with the police and to allow Binion to go home if he signed a statement.  Binion said he was not allowed to read the full statement and did not know what he was signing. 

Officer Peter Larcher, a forensic investigator, testified that he recovered four 9-millimeter cartridge cases from the crime scene.  Dr. Barry Lifschultz, a forensic pathologist, testified that he examined Thomas's body and recovered one medium caliber, copper-jacketed lead bullet that had passed through the victim's brain.  The parties stipulated that, if called to testify, Lisa Peloza, an expert in the field of firearms examination, would testify that the bullet recovered from Thomas's brain was from a 9-millimeter firearm, and the four shell casings found at the scene all were fired from one 9-millimeter weapon.

Chicago police officer Sharon D. Tyler testified that she helped apprehend Patrick Jones on October 20, 1998, near Englewood High School.  When police officers approached Jones, he fled.  Jones had no drugs or other contraband on his person when he was apprehended.  

Detective Maude Noflin testified that she advised Jones of his rights and he agreed to talk with her.  He initially denied involvement in the shooting but then stated that the shooting was "an organized hit" by a commander of the Black Disciples street gang.  Jones told Noflin that he was with Binion on 64th Street between Vernon and Eberhart Avenues when a black car approached.  Jones' orders were to run toward the black car, divert the driver's attention by acting as if he had a handgun and induce the driver to turn on Vernon Avenue.  Jones did not tell Noflin whether he shot at the car.  Noflin testified that McGee identified Jones in a lineup.  She also testified that Jones told her he was "treated fine" by the police.

Assistant State's Attorney McGuire testified that he met with Jones on October 21, 1998, and advised Jones of his rights under 
Miranda
.  Jones signed a document stating his rights.  Jones said he had been treated "okay" by the police.  Jones agreed to have McGuire prepare a handwritten statement.  When Jones asked for an attorney near the end of the statement,  McGuire stopped the interview and Jones did not sign the statement.  McGuire testified to his refreshed recollection of statements Jones made before requesting counsel--that the shooting occurred because the black car had entered Black Disciples territory on an earlier occasion, with the occupants shouting out gang threats and insults.  Jones admitted that when the black car was seen in his gang's territory on August 28, 1998, Jones had a gun and fired a number of shots in the passenger side window.  McGuire did not review the statement with Jones because Jones had asked for an attorney.  

Dionte Jones (Dionte), defendant Jones' cousin, testified that Jones went with him to an appointment at Cook County Hospital at the time of the shooting.  Patricia Jones, defendant Jones' mother, testified that her son was with Dionte at Cook County Hospital at the time of the shooting.

Defendant Jones testified that he was with Dionte at Cook County Hospital at the time of the shooting and later visited friends and family until 9 p.m.  Jones said he fled when the police approached him on the Englewood High School grounds because he was trespassing and had a bag of marijuana in his pocket, which he discarded before he was apprehended.  The police told him he was being held for a misdemeanor.  Jones was handcuffed and held overnight at the police station.  The next morning, Noflin told him for the first time that he was being held for murder.  Jones said he was not allowed to call a lawyer or his mother and was given only a small amount of food.  Jones told the police he wanted to "plead the fifth."  Jones testified that Noflin's partner, Detective Steven Bradley, was a "big" and "muscular" man who slapped and beat Jones.  When Jones told Bradley of a surgical rod in his back, Bradley struck Jones in his ribs and said, "This should hurt then."  Jones said  Bradley "kept hitting me on my back until I broke down to the floor."  Jones said an assistant State's Attorney told him to sign documents in order to "plead the fifth."  Jones said he signed the documents because he was 17 and did not know better.  Bradley returned to the interview room later that night and told Jones they were going to "play hardball."  Jones was then taken to the county lockup where a police officer beat and kicked him and threatened him with a bat.  Jones testified that he did not sustain visible bruises or swellings as a result of the beatings and he told no one except this mother about the beatings.

Paramedic Johnny Musa testified that he examined Jones when Jones was admitted to Cook County jail on October 22, 1998, and saw no bruises or injuries. 

On February 22, 2001, the juries returned guilty verdicts as to both defendants.  Both defendants filed motions for a new trial which the trial court denied. 

On appeal, both defendants claim that Coleman's unexpected testimony about his polygraph test improperly bolstered the truth of his pretrial statements inculpating defendants.  Binion also claims that the State failed to prove his guilt under the accountability theory beyond a reasonable doubt.  Jones also claims: (1) the trial court gave an improper jury instruction; (2) his trial was unfair because the State informed the jury that the police located his photograph in the I-Cam system, which tracks arrestees; and (3) the cumulative effect of the errors denied him a fair trial. 

Defendants first assert that the trial court abused its discretion in allowing testimony about Coleman's polygraph test because the evidence was inadmissible, prejudicial and tainted the integrity of the judicial process.  Defendants argue that Coleman's original inculpatory statements were improperly bolstered and his exculpatory trial testimony was unfairly discredited when Lazzara testified after Coleman, saying that the polygraph exam took place before Coleman gave his written statement.  The State argues that the polygraph evidence was properly admitted because: (1) the evidence was first elicited by the defense, not the State; and (2) the chronology of the police investigation became relevant after Coleman claimed on cross-examination that his statement was coerced.

 In considering a challenge to the admissibility of evidence, we review whether the trial court's decision to allow the evidence in question was an abuse of discretion.  
People v. Hawkins
, 326 Ill. App. 3d 992, 995, 762 N.E.2d 46 (2001).  As defendants point out, evidence of a polygraph examination of a witness is inadmissible at a trial.  
People v. Gard
, 158 Ill. 2d 191, 204, 632 N.E.2d 1026 (1994).  Our supreme court has held that the polygraph is not sufficiently reliable to establish guilt or innocence, yet its quasi-scientific nature could lead a jury to give the evidence undue weight despite its unreliability.  
People v. Jefferson
, 184 Ill. 2d 486, 493, 705 N.E.2d 56 (1998).  But, the supreme court has determined that a trial 
court may admit polygraph testimony "to flesh out the circumstances surrounding a confession," but "only in the limited circumstances outlined in 
Jefferson
."  
People v. Jackson
, 202 Ill. 2d 361, 372, 781 N.E.2d 278 (2002).  "We will not condone the anticipatory introduction of polygraph evidence by the State."  
Jackson
, 202 Ill. 2d at 372.   "[E]vidence that is inadmissible may become admissible if the defense opens the door to its introduction."  
Jefferson
, 184 Ill. 2d at 497.  See 
People v. Rosemond
, 339 Ill. App. 3d 51, 61, 790 N.E.2d 416 (2003) (the "
Jefferson
 exception" allows the limited admission of polygraph evidence but requires the trial court to exercise "enhanced scrutiny" when the State introduces it); 
People v. Johnson
, 208 Ill. 2d 53, 105, 803 N.E.2d 405 (2003) (polygraph evidence becomes proper where questions have been raised as to the reliability and timing of a statement).

Although both 
Jefferson
 and 
Jackson
 differ factually from this case, the facts here are closer to 
Jefferson
 than to 
Jackson
.  In 
Jefferson
, as here, the defendant testified on direct examination that her inculpatory statement was untrue and coerced by police.  
Jefferson
, 184 Ill. 2d at 490-91.  In a sidebar during the State's cross-examination of the defendant, the prosecution asked the court to admit evidence showing that only minutes before the defendant confessed, she learned that she was scheduled for a polygraph test that she had previously agreed to take.  
Jefferson
, 184 Ill. 2d at 491.  The trial court admitted the evidence but instructed the jury to consider the polygraph evidence only for the limited purpose of deciding whether the defendant's inculpatory statement was voluntary or coerced.  
Jefferson
, 184 Ill. 2d at 498.  Acknowledging that determining the voluntariness of a confession is the province of the trial court, the supreme court concluded that the trial court properly allowed the State to rebut the defendant's claim of coercion.  The testimony provided an alternative explanation for the defendant's inculpatory statement
: she confessed to avoid a polygraph test, not because the police coerced her.  The court reasoned that the jury would have been misled if the evidence of the impending polygraph test had not been admitted. 

In contrast, 
the supreme court in 
Jackson
, four years later, concluded that a witness' testimony that he took a polygraph test was improperly admitted.  
Jackson
, 202 Ill. 2d at 373.  On direct examination by the State, the witness contradicted his earlier statement inculpating the defendant, but did not say the statement was coerced.  
Jackson
, 202 Ill. 2d at 364-65.  In response, the State asked the witness whether he took a polygraph test and was called a "liar" by the examiner just before making his inculpatory statement.  Defense counsel objected.  The State argued that while the polygraph evidence was inadmissible against the defendant, it was admissible to show the "course of conduct" leading to the witness' statement against the defendant.  The trial court admitted the evidence "for a limited purpose" but did not elaborate.  The State continued to question the witness about the polygraph test, eliciting the witness' admission that after being confronted with the negative results of his polygraph test, he implicated the defendant.  In subsequent testimony, the witness claimed for the first time that his statement against the defendant was coerced by the police.  
Jackson
, 202 Ill. 2d at 365.  The supreme court reversed, concluding that when the trial court allowed the polygraph evidence, it served no legal purpose because the witness had not yet testified that his statement was coerced by the police.  
Jackson
, 202 Ill. 2d at 370-71.  It was "plain error to admit polygraph evidence in a criminal trial 
in anticipation 
of evidence potentially justifying its admission as an alternative explanation for an inculpatory statement."  (Emphasis added.)  
Jackson
, 202 Ill. 2d at 373.  Polygraph evidence may be admitted on a limited basis only when the testimony is used as a "shield" against a defendant's claims of police misconduct, as in 
Jefferson
, not as a "sword" to advance the State's case.  
Jackson
, 202 Ill. 2d at 371.

This case differs from both 
Jefferson
 and 
Jackson
 in that evidence of a polygraph test first made its way into the record from the mouth of a witness under cross-examination by the defense.  The record makes clear that the reference by Coleman to a polygraph examination was elicited neither by the State nor the defense.  But, in the context of Coleman's trial testimony that his pretrial statement was coerced, his subsequent reference to the polygraph examination could have left the jury with the impression that the police first coerced a statement from Coleman and then forced him to undergo a polygraph examination.  The possibility of misleading the jury can be a determinative factor in the
 decision to admit polygraph evidence, as it was in 
Jefferson
. 
Here, Coleman first testified on direct examination that his pretrial inculpatory statements were untrue and coerced by the police, as did the defendant in 
Jefferson
.
  Then, on cross-examination, Coleman disclosed that he had been taken for a polygraph examination, this in response to a question from counsel for defendant Binion.  The trial court allowed the State on redirect to explore the circumstances surrounding the statement, rebutting Coleman's claim of coercion.  There was no anticipatory introduction of the polygraph evidence by the State because Coleman's claim of coercion already was before the jury.  As in 
Jefferson
, the trial court here gave limiting instructions to the jury, explaining how the evidence was and was not to be used.  Because there was no anticipatory introduction of polygraph evidence
 here, we believe the trial court did not abuse its discretion in admitting Coleman's polygraph testimony.

The trial court, outside the presence of the jury, made it clear that it understood the underlying rationale of 
Jefferson
 for allowing references to a polygraph examination under certain circumstances.  A claim by a witness at trial that his pretrial statement was the product of police misconduct puts in play rebuttal evidence by the State that will bolster the voluntariness of the pretrial statement.  One way to do this is to offer evidence of a polygraph examination.  The rationale is straightforward: no one sly enough to induce a lie would then be stupid enough to ask the liar to submit to a polygraph exam.

Nor did the admission of the polygraph evidence improperly bolster Coleman's original statement.  Binion in his appellate brief argues, "[w]hile the results of the polygraph examination did not come in directly they nevertheless came in indirectly.  The logical inference is that the story Coleman initially told Detective Lazzara was true and each of the other stories that corroborate Coleman's initial story are also true."  Jones argues that "[w]hether Coleman told the truth at trial, or in prior statements, was for the jury to decide.  That determination was swayed, though, by evidence that the morning after Coleman made his statement to police, he submitted to a lie detector test, before an [assistant] State's Attorney took his written statement."

Improper bolstering of a witness' testimony, especially in combination with other errors,  can justify reversal of a criminal defendant's conviction.  See, for example,
 
People v. Miller
, 302 Ill. App. 3d 487, 498, 706 N.E.2d 947 (1998).  Here, the State's use of Coleman's testimony was not reversible error.  As noted, the evidence was not closely balanced.  The trial court did not abuse its discretion because the evidence here conformed to the recognized exceptions that allow polygraph evidence--the defense opened the door to its introduction and the State used the evidence to rebut Coleman's claim of coercion.  
Jefferson
, 184 Ill. 2d at 497-98. 

Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.
 

Next, Jones claims that the trial court misstated the law in its instruction to the jury on eyewitness opinion testimony.  The transcript shows that the trial court read Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1992) (hereinafter IPI Criminal 3d), in this way:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence including but not limited to the following: The opportunity the witness had to view the offender at [the] time of the offense or[] the [witness'] degree of attention at the time of the offense or the [witness'] earlier description of the offender or the level of certainty shown by the witness when confronting the [d]efendant or the length of time between an offense and the identification confrontation."  

Although Jones did not object to this instruction at trial, he now claims it was erroneous because the trial court read the disjunctive term "or" between the five factors for weighing eyewitness testimony.  This, he asserts, "grossly understated" the importance of the factors in the eyes of the jurors and warrants reversal under 
People v. Gonzalez
, 326 Ill. App. 3d 629, 641, 761 N.E.2d 198 (2001) (the defendant was entitled to a new trial where the instruction was erroneous and the evidence was closely balanced).  In 
Gonzalez
, the court concluded that when IPI Criminal 3d No. 3.15 is given, the trial court should not read the word "or" between the factors because the jury is to consider all factors included in the instruction.

The Supreme Court has determined that "giving IPI Criminal No. 3.15 with the 'ors' is indeed plain error."  
People v. Herron
, No. 95135, slip op. at 19 (May 19, 2005).  In addition, the comments to IPI Criminal No. 3.15 in the 2003 supplement to IPI now direct that the "or" (or the "and") between the factors is not to be read to the jury or included in the typed version given to the jury.  IPI Criminal 4th No. 315, Committee Note, at 2 (Supp. 2003).

But the seriousness of the risk of an improper conviction due to the erroneous reading of "or" in the instruction "depends upon the quantum of evidence presented by the State against the defendant."  
Herron
, slip op at 21.  In 
Gonzalez
, reversal was warranted because the evidence was closely balanced and the instruction was unduly stressed by the prosecutor in closing argument.  
Gonzalez
, 326 Ill. App. 3d at 63-64.  Accord 
Herron
, slip op. at 19.  Here, the evidence was not closely balanced nor was the erroneous instruction emphasized to the jury.  The error was harmless.  

Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.

Finally, Jones cites 
People v. Whitlow
, 89 Ill. 2d 322, 341, 433 N.E.2d 629 (1982), and 
People v. Albanese
, 102 Ill. 2d 54, 83, 464 N.E.2d 206 (1984), to argue that the cumulative impact of trial court error requires the reversal of his convictions.  We find that defendant has failed to establish cumulative error.  As we have determined, the trial court did not err in admitting Coleman's polygraph testimony.  The trial court properly gave the jury a limiting instruction about polygraph evidence and barred Lazzara from disclosing the test results.  Defendant's other claims--that the trial court erred in its reading of a jury instruction and in allowing Lazzara's I-Cam system reference–fail in light of the overwhelming evidence against defendant.  See 
People v. Speight
, 153 Ill. 2d 365, 376-77, 606 N.E.2d 1174 (1992) (cumulative error analysis requires an assessment of whether errors were properly offset by jury admonishments and, if not, whether the errors were harmless).

The judgment of the circuit court is affirmed.

Affirmed.

BURKE and GARCIA, JJ., concur.