# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Matthews*, 2012 IL App (1st) 102540

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appelle, v. ANGELA MATTHEWS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-2540 |
| Filed | October 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's errors in admitting a polygraph examination taken by a prosecution witness and in admitting the witness's prior consistent statements about defendant's admission that she committed the charged offense of first degree murder required the reversal of defendant's conviction and a new trial. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-21132; the Hon. Rosemary Grant-Higgins, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Maria A. Harrigan, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan F. Frazier, and Tasha Marie Kelly, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE SALONE delivered the judgment of the court, with opinion.

Justices Neville and Sterba concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Angela Matthews, was convicted by a jury of first degree murder for the killing of Elmer Brown. On appeal, defendant argues the trial court improperly admitted the following evidence: (1) a polygraph test taken by one of the State's witnesses, (2) prior consistent statements made by a State witness, and (3) a videotape showing defendant in the police interrogation room. The first two claims are addressed below.

¶ 2                                BACKGROUND

¶ 3    After friends were unable to get in touch with him for several days, Elmer Brown was reported missing on Friday, September 7, 2007. Police arrived at Brown's apartment shortly thereafter and found him dead, lying on his bedroom floor. He had been stabbed numerous times.

¶ 4    Defendant was dating Brown at the time of his death. She had keys to his apartment, where she often stayed, as well as keys to both of his vehicles. Defendant, a drug addict, was with Brown most of the day on September 3 and left Brown in his home around 10 p.m. in search of drugs. She used drugs twice on this outing, with two friends. When she returned to Brown's apartment early in the morning on September 4, she discovered Brown had been killed. Defendant stated she was afraid to call police because, since she had been living there, her DNA and fingerprints were in the apartment and she saw no signs of forced entry. After covering Brown's body with a sheet, she quickly gathered some of her belongings and left the apartment, taking one of Brown's cars.

¶ 5    Defendant spotted another friend and drug addict, Sherry Dillon, walking down the street and offered her a ride. The two got high together, and defendant told Dillon she knew of a way for the two of them to get money to purchase more drugs. She took Dillon to Brown's apartment, planning to take and sell his flat-screen television. The television was located in the bedroom, where Brown's body was. Defendant and Dillon took the television and sold

it a little while later, splitting the proceeds. Defendant took Dillon home, then went to her mother's home. Dillon did not alert the police to Brown's death.

¶ 6 When police discovered Brown's body, a short investigation led to the arrest of Dillon for the theft of Brown's television. Dillon was taken to the police station and interviewed by two detectives. She then was given a polygraph exam. After the polygraph exam, Dillon gave a statement to an assistant State's Attorney (ASA) in which she stated defendant claimed to have killed Brown. Dillon was held in custody through the weekend, then taken to testify before a grand jury the following Monday. Dillon was later released from police custody, without being charged with any crime in connection with the theft of Brown's television or with his murder. Defendant was eventually arrested and charged with Brown's murder.

¶ 7 At trial, the State called Dillon to testify. She stated that while she and defendant were on their way to Brown's apartment, defendant claimed to have killed Brown but refused to give any additional explanation of what happened. Dillon testified that at no time did any police officer or the ASA promise her anything in exchange for her statement, nor did anyone coerce her into giving the statement. The State also called two of the detectives who interviewed Dillon. Each of them also corroborated Dillon's testimony that she had not been coerced or promised anything in exchange for her statement.

¶ 8 The defense called Rena Hull-Hughey, the defendant's mother, to testify. Hull-Hughey stated that about three weeks after defendant's arrest, she confronted Dillon about her statement to police. According to Hull-Hughey, Dillon said she was told that if she did not give a statement against defendant, she (Dillon) would be charged with Brown's murder. Hull-Hughey also testified that Dillon explained the reason she had been released from custody and not charged with a crime was because she gave the statement implicating defendant.

¶ 9 The State then sought to introduce evidence of Dillon's polygraph exam, to which the defense counsel objected. After carefully considering the arguments by both parties, the court concluded that the evidence was admissible, provided the jury was instructed not to consider it for any purpose other than the circumstances leading to Dillon's statement to the ASA. After the jury was properly instructed on the polygraph evidence, the defendant was convicted. This timely appeal followed.

¶ 10                                                    ANALYSIS
¶ 11                              Introduction of Polygraph Evidence
¶ 12 Defendant maintains that admission of the polygraph evidence constituted reversible error. This case presents us with a novel question: whether testimony by one witness can open the door to admission of the polygraph exam of another witness.

¶ 13 Generally, evidence regarding polygraph exams is inadmissible. *People v. Baynes*, 88 Ill. 2d 225 (1981). There are several reasons for this rule. One is that the results are not sufficiently reliable to use as proof of guilt or innocence. Another reason is that because polygraphs are quasi-scientific in nature, jurors may give them undue weight despite their inherent unreliability. *People v. Taylor*, 101 Ill. 2d 377, 391-92 (1984). Simply put, even though polygraph exams are not reliable, jurors may likely assume they are. *Id.* at 392.

Another concern is that admission of unreliable evidence might impinge upon the integrity of the judicial process. *Baynes*, 88 Ill. 2d at 244. Because the scientific reliability of the exam does not depend on the test subject, the rule against admissibility holds whether the polygraph exam in question was taken by a defendant or by a witness. *People v. Gard*, 158 Ill. 2d 191, 204 (1994).

¶ 14　　In *People v. Jefferson*, 184 Ill. 2d 486 (1998), our supreme court carved out an exception to the general rule against admitting polygraph evidence. In *Jefferson*, the defendant claimed at trial that she confessed because she was promised she would be released to visit her child, who only had a few hours left to live. The State then wanted to introduce evidence that shortly before giving the statement to police, defendant was scheduled to take a polygraph exam. The court upheld the admission of the polygraph evidence for the purpose of providing an alternative explanation for the reason behind defendant's confession. While the results of a polygraph exam were still deemed inadmissible, the court held if a defendant makes a statement and later claims the statement was coerced or induced by promises made by authorities, evidence of his or her polygraph exam is admissible to rebut that claim. *Jefferson*, 184 Ill. 2d at 496-97. The *Jefferson* rule has been extended to witness testimony as well. See, *e.g.*, *People v. Jackson*, 202 Ill. 2d 361 (2002) (discussing the admissibility of polygraph evidence of a State witness); *People v. Binion*, 358 Ill. App. 3d 612 (2005) (upholding admission of polygraph evidence of State's witness).

¶ 15　　The State makes two arguments in support of allowing Dillon's polygraph exam to be introduced. First it argues that by his cross-examination of Dillon and two of the detectives who interviewed her at the police station, defense counsel implied that something improper occurred between Dillon and the police. During trial, the defense counsel asked Dillon if she was surprised when the police let her go home without charging her with any crime, even though they knew she had taken Brown's television. Defense counsel later asked the detective that took Dillon home whether she seemed surprised that she was being released from custody. The State argues that this questioning itself raised the claim that Dillon was coerced or promised something. As defendant correctly points out, counsel's line of questioning is not evidence, and the implications raised by those questions cannot be considered in the calculus of whether to admit polygraph evidence.

¶ 16　　The State's main argument is based on Hull-Hughey's testimony that Dillon told her she was coerced into making the statement. The State contends that because a claim of coercion was made at trial, the door was opened for the admission of the polygraph evidence. Dillon never claimed she had been coerced. She never recanted or modified her assertion that defendant claimed to have killed Brown, nor did she ever provide any other motive for giving the statement other than wanting to tell the truth. Dillon gave a statement implicating defendant to the police when she was first arrested. She repeated that version of events to a grand jury. At trial she not only made this assertion under oath, but again denied ever being coerced or promised anything in exchange for a statement against the defendant.

¶ 17　　The State concedes that in *Jefferson* and the line of cases that followed, when polygraph evidence has been admitted, it was to impeach the testimony *of the witness who took the polygraph exam*, not, as here, to impeach a third party. Nevertheless, the State maintains that no matter how the evidence of coercion was introduced–whether inference from defense

counsel's line of questioning or from another witness's testimony–the net effect was the same: the jury was led to believe that Dillon's statement was coerced.

¶ 18     When the witness who took the polygraph changes his or her version of events surrounding statements to police at trial, the jury is left with a mistaken impression about the circumstances prompting those statements. *Jefferson*, 184 Ill. 2d at 496. Only one narrative is presented–that of the witness who has changed his or her version of events since making statements to police. In these instances, prohibiting the State from introducing polygraph evidence would permit the defendant to take unfair advantage of the rule against admission of such evidence. *Id.* at 497. The polygraph evidence essentially serves as a surrogate rebuttal witness.

¶ 19     In disregarding by whom the claim of coercion is made, the State misses this key distinction. While it is true the State had the right to rebut Hull-Hughey's claim of coercion, it had a way to do this other than the polygraph evidence: the State simply could have questioned Dillon directly on the matter. There was no need for a surrogate rebuttal witness in the form of polygraph evidence, because an actual rebuttal witness was available to testify. The function of juries is to assess the credibility of witnesses, to determine the weight to give testimony, and to resolve conflicts or inconsistencies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). The jury was presented with Dillon's testimony and Hull-Hughey's testimony; it should have been left to the jury to decide which theory it believed. However, the introduction of the polygraph evidence served not just to rebut Hull-Hughey's testimony but, rather, to infringe upon the function of the jury by giving more credibility to Dillon's testimony.

¶ 20     In admitting the evidence, the trial court relied on language in *People v. Binion*, 358 Ill. App. 3d 612 (2005). In *Binion*, a witness testified on direct examination that his statement implicating the defendants was coerced. On cross-examination, the witness admitted that he had been taken for a polygraph exam after he gave his statement. The trial court here focused on language in *Binion* that questioned why the police would take someone to take a polygraph exam after they allegedly coerced that person into giving a statement. See *Binion*, 358 Ill. App. 3d at 625. This question did not ultimately decide the case. Furthermore, that question misses the point. The determinative issue is not why a polygraph was given but, rather, what effect introduction of polygraph evidence has on the trier of fact.

¶ 21     The trial court has the discretion to admit or exclude rebuttal evidence, and we will not disturb the trial court's decision absent an abuse of that discretion. *People v. Rosemond*, 339 Ill. App. 3d 51, 63 (2003). By admitting polygraph evidence based on a third party's claim of coercion, the trial court abused its discretion by attempting to expand the narrow exception outlined in *Jefferson*. The rule against admitting polygraph evidence is meant to counteract the undue weight given such faulty evidence by juries and to prevent the impingement of the integrity of the judicial system. Both those purposes were circumvented here. Polygraph evidence was not only used to support the credibility of Dillon's actual testimony, but also served to remove from the jury its core functions–resolving conflicts in testimony and determining the weight to give the testimony presented. In addition, to expand the *Jefferson* exception and allow polygraph evidence to be introduced solely on the claims of coercion by a third party would have the effect of precluding a defendant from challenging or

questioning any witness's prior statements. We find today that a third person cannot be used to circumvent the rule against admission of polygraph evidence, even where that third party was brought to testify specifically to claim that the witness was coerced.

¶ 22                                   Prior Consistent Statements

¶ 23     Defendant next argues that the State improperly introduced prior consistent statements by Dillon. Dillon was called to testify a second time, and on redirect examination she was questioned specifically about the written statement she gave to police after her arrest and the testimony she gave to the grand jury. Both her written statement and her grand jury testimony were consistent with her trial testimony, namely, that defendant claimed to have killed the victim and that Dillon had not been promised anything or coerced into making this claim.

¶ 24     As a general rule, a witness cannot be rehabilitated by admitting former statements consistent with his or her testimony. *People v. Heard*, 187 Ill. 2d 36, 70 (1999). An exception exists only where there is a claim that the witness has recently fabricated the testimony or the witness has a motive to give false testimony. *Id.* In these cases, prior consistent statements may be admitted, but only if they were made before the motive to fabricate arose. *Id.*

¶ 25     The State does not dispute that Dillon's written statement and grand jury testimony constituted prior consistent statements. The State focuses on the fact that the statements were used to rebut an allegation that Dillon had a motive to testify falsely. The State, however, ignores the other critical component of the exception–that the statements must have been made before the motive to fabricate arose. Instead, the statements used here were made after any purported coercion took place, not before. The trial court erred in admitting Dillon's written statement and grand jury testimony.

¶ 26     But the analysis does not end there. Defendant admits that trial counsel failed to object to the admission of these statements. As a general rule, a defendant forfeits review of any claims that were not objected to at trial and raised in a posttrial motion. However, an appellate court may review an otherwise forfeited claim under the plain error doctrine. *People v. Herron*, 215 Ill. 2d 167, 176-77 (2005). Plain error review is appropriate where either (1) the evidence was so closely balanced that the verdict against defendant may have resulted from the error, regardless of the seriousness of the error, or (2) the error was so serious that the defendant was denied a substantial right and the error challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010).

¶ 27     We consider the second prong first. Our supreme court has long held that claims that prior consistent statements used to improperly bolster a witness's credibility do not implicate a substantial right. *People v. Keene*, 169 Ill. 2d 1, 18-19 (1995). Therefore, for the error to be plain, defendant must show that the evidence was closely balanced.

¶ 28     Here the evidence was indeed closely balanced. There was a striking lack of any physical evidence. The defendant's DNA was found underneath the victim's fingernails. This, however, has a benign explanation, as the two were involved in a sexual relationship, and an expert testified that DNA can be transferred during sexual intercourse. The only other physical evidence linking the defendant to the victim were her fingerprints on a small metal

tin resting on a table next to the bed. No other evidence found on the victim's body or in the immediate vicinity connected the defendant to the murder. The murder weapon was never recovered. Despite the defendant being seen driving the victim's car mere hours after the murder took place, no blood or other physical evidence was found in the victim's car. No traces of blood were found on any of defendant's clothing or other possessions.

¶ 29     Much of the State's case relies on Dillon's testimony that the defendant admitted to killing Brown. Any error in the admission of evidence is particularly serious where, as here, the evidence is being used to bolster the credibility of a witness critical to the State's case. Given this, and the closeness of the evidence, defendant has shown that the erroneous admission of prior consistent statements of the witness was a material factor in her conviction. Thus, the admission of these statements constituted plain error.

¶ 30     Finally, we must address the double jeopardy issue that arises. The double jeopardy clause of the United States Constitution prohibits the State from having another opportunity to try a case unless it has in the first trial presented sufficient evidence to prove the defendant guilty beyond a reasonable doubt. *People v. Macon*, 396 Ill. App. 3d 451, 458 (2009). This rule does not prevent a retrial due to error in the proceedings below. *Id.* Since the State can reindict and retry the defendant, we are required to rule upon the sufficiency of the evidence. *Id.* Here, considering the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found defendant guilty beyond a reasonable doubt. This finding is not binding on retrial and does not indicate this court's determination as to the defendant's guilt or innocence.

¶ 31     Because we find the first two issues raised by the defendant dispositive, we decline to address her remaining claim. For the foregoing reasons, we reverse the defendant's conviction and remand to the circuit court of Cook County for a new trial consistent with this opinion.

¶ 32     Reversed and remanded.