2020 IL App (1st) 170007-U

No. 1-17-0007

Order filed February 27, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 7456 |
| | ) | |
| ADRIAN GARCIA, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for first degree murder and armed robbery where the admission of a witness's prior consistent statement, even if error, was not plain error because the evidence was not closely balanced. Additionally, we vacate defendant's 2002 conviction for aggravated unlawful use of weapon.

¶ 2    Following a jury trial, defendant was convicted of first degree murder (720 ILCS 5/9-1(a) (West 2010)) and armed robbery (720 ILCS 5/18-2(a)(1) (West 2010)) and sentenced to consecutive prison terms of 33 and 7 years, respectively. Defendant appeals, arguing (1) he is

entitled to a new trial based on the admission of a witness's prior consistent statement; and (2) his 2002 aggravated unlawful use of weapon (AUUW) conviction in case No. 02 CR 26696 must be vacated pursuant to *People v. Aguilar*, 2013 IL 112116, and *In re N.G.*, 2018 IL 121939.[1] The parties, pursuant to a stipulation, have supplemented the record to include the charging instrument and sentencing order from defendant's 2002 AUUW conviction. We vacate defendant's 2002 AUUW conviction and affirm the trial court's judgment.

¶ 3    In the early morning hours on April 11, 2011, Armando Corral was beaten to death and robbed of his wallet by a group of men near the La Roka bar, which is located in the 3000 block of South St. Louis Avenue in Chicago. The State charged defendant and two codefendants, Mario Ascensio and Mauricio Ortiz, by indictment with first degree murder and armed robbery. Prior to trial, Ascensio pled guilty to armed robbery and Ortiz pled guilty to first degree murder. They were sentenced to 16 and 23 years' imprisonment, respectively, and are not parties to this appeal. Defendant elected a jury trial, at which the following evidence was presented.

¶ 4    Prior to setting forth the relevant evidence, we note defendant, Ascensio, Ortiz, and Alejandro Rios were referred to by their nicknames by various witnesses throughout the trial. For the sake of clarity, we will refer to Ascensio, Ortiz, and Rios by their given names. Additionally, we will refer to the victim as Corral despite the fact that some of the witnesses did not know him by name.

---

[1] In his opening brief, defendant also contended his conviction for armed robbery should be vacated under the one-act-one-crime rule. However, in his reply brief, he withdrew this contention, acknowledging that our supreme court's decision in *People v. Smith*, 2019 IL 123901, which was issued while his appeal was pending, compelled the opposite conclusion.

¶ 5    Mayra Dominguez testified that, in the early morning hours on April 11, 2011, she was working on her computer in her second-floor apartment on South St. Louis. Through her open window, she heard bottles breaking and "punching sounds." She looked out the window and observed three men beating up Corral, who fell to the ground in front of the house next door to her apartment. The three men continued to beat him. Dominguez recognized two of the assailants as being defendant, who she had known for more than 10 years and who lived across the street from her, and his friend, Ortiz. Dominguez recalled that, during the assault, defendant kicked Corral in his head, held onto a fence, and jumped on his chest, while Ortiz kicked Corral in his arms, legs, and head, and the third assailant kicked Corral in his legs. Rios, who was Dominguez's downstairs neighbor, was neither involved in nor present during the fight.

¶ 6    Dominguez knocked on the window in an attempt to stop the beating of Corral and then called 911. She returned to the window, at which time she observed defendant kicking Corral's head. Defendant then reached into Corral's pocket, took his wallet, and said "that's what you get for acting up." Defendant, Ortiz, and the third man returned to the corner by La Roka. When the police arrived, Dominguez observed defendant go to his house, Ortiz walk through a gangway to the back of her house, and the third man walk to the steps in front of her house.

¶ 7    Dominguez did not speak with the police when they arrived because she was scared. At approximately 6 a.m., the police returned to her house and knocked on her door. Dominguez testified she was interviewed by detectives, and the following colloquy then occurred without objection from defendant:

> "Q. And you essentially told [the detectives] what you have told us today, is that correct?

A. Yes."

¶ 8    Dominguez viewed a physical lineup and identified defendant as the man she had observed jumping on the victim's chest. She viewed a photographic array and identified Ortiz as the person she had seen kicking the victim's head and arms.

¶ 9    On cross-examination, she acknowledged she told the 911 operator there were five men, not three, attacking Corral, did not provide physical descriptions, and, despite the fact she knew two of the assailants, did not give the operator their names.

¶ 10    David Silva testified that, at approximately 8 p.m. on April 10, 2011, he went to La Roka with his friends, Ray and "Tricky." Ascensio was already at La Roka when Silva arrived. Silva believed he observed defendant, who he knew from the neighborhood, at La Roka while he was there but did not pay attention to what defendant was doing or who he was with. Silva did not recall whether Corral was at La Roka by the time he left.

¶ 11    Silva and Tricky left La Roka a couple hours later, went to the attic of Tricky's residence, which was located on the same block, and continued to drink. Approximately 30 to 60 minutes later, Silva heard a "commotion," which sounded like beer bottles breaking. He looked out a small window and, from a distance of 25 to 30 feet, observed two men standing by a third man, who was lying on the ground on the sidewalk in front of Tricky's residence. One of the two men, who Silva recognized as Ascensio, threw a bottle at the man on the ground. Silva then moved away from the window and "that [was] it."

¶ 12    Silva only observed the back of the other man and did not recognize him. He never observed the other man's face but recalled he was wearing a gray or white sweater. He did not

observe anyone standing across the street when he looked out the window. The last thing he observed as he looked out the window was Ascensio throwing the beer bottle.

¶ 13    Silva called 911 and did not look out the window again. He left Tricky's residence before emergency personnel arrived. The next day, Silva spoke with detectives and viewed a photographic array and physical lineup. In both, he identified Ascensio as the man who had thrown the beer bottle.

¶ 14    Ascensio testified he was a participant in the beating and robbery of Corral. He acknowledged that, in exchange for his guilty plea to armed robbery and his truthful testimony in the case against defendant, the State agreed to dismiss the first degree murder charge against him and recommend a sentence of 16 years' imprisonment. He also testified the sentencing ranges he faced prior to pleading guilty were 20 to 60 years for first degree murder, which would have been served at 100%, and 6 to 30 years for armed robbery. He acknowledged that, with good behavior, he would likely serve only eight years of his sentence.

¶ 15    At approximately 12 p.m. on April 10, 2011, Ascensio went to La Roka, at which he was a regular customer, with Jose Lopez. The pair sat at the bar drinking beer and watching "the game." Later that evening, defendant and Ortiz came into La Roka. Corral came into the bar around midnight, sat with a couple of friends, and drank beer. About an hour before the bar closed, Corral was arguing with a "short bald guy," whom Ascensio did not know. The man "tried swinging" at Corral, and Corral turned around, swung, and hit the man. After the altercation, the other man was kicked out by the bartenders, and Corral remained in the bar.

¶ 16    Ascensio was shown a photograph of Rios, and the State asked him whether Rios was in the bar that night and whether he was the person who had fought with Corral. Ascensio replied in

the negative. Ascensio did not observe Rios at any time on the night of April 10 or the early morning of April 11.

¶ 17    The bar closed about an hour after the altercation between Corral and the other man, and the bartenders asked all the patrons to leave. Corral was the first to leave the bar, followed by defendant and Ortiz. Ascensio left after them. Ascensio observed Ortiz and defendant punch Corral in the face "a few houses down" from La Roka, and Corral fall to the ground. Once Corral was on the ground, Ortiz and defendant began kicking him. Defendant held onto a fence and jumped on Corral's chest. Ascensio threw a bottle at Corral and kicked him in the legs. After the beating stopped, defendant bent down and took Corral's wallet. Defendant, Ascensio, and Ortiz then walked back to the corner by La Roka, where defendant and Ortiz went through the contents of Corral's wallet. When the three men heard sirens, they all "ran off." Ascensio went to 3008 South St. Louis. He did not observe where defendant ran but, after the police arrived, he observed defendant in front of his house on the other side of the street. He denied the first punch was thrown near La Roka. Rather, it was thrown a "few houses down" from the bar.

¶ 18    Ascensio was arrested on April 12, 2011, and spoke with detectives at least four times before April 14, 2011. During those interviews, Ascensio lied and maintained he was not present and not involved in Corral's beating. He also told detectives that defendant and Ortiz went to help an off-duty bartender, nicknamed "Shorty," who was in a fight. It was not until his fourth interview that he told detectives he observed defendant holding onto a fence and jumping on Corral.

¶ 19    Ascensio denied: telling police defendant had punched a "short bald Mexican"; smoking a cigarette with defendant and telling police he had done so; and saying "why are those jag-offs identifying me, I didn't do anything." Ascensio did not remember telling detectives: he did not

know who "went through" Corral's pockets; a "short guy" came from across the street when he exited the bar; and he had only told them 75% of what happened. However, defense counsel perfected impeachment of this testimony during defendant's case, when the parties stipulated Ascensio had, in fact, made these statements.

¶ 20    Gustavo Flores testified that, on April 10, 2011, he tended the bar at La Roka. That evening, defendant, Ortiz, and Ascensio were inside the bar. Corral came into the bar after midnight, ordered one beer, stood by the pool tables, and did not interact with anybody. Flores testified that, while he was working, there was no "trouble" or fights inside the bar, and he did not expel anyone from the bar.

¶ 21    Reina Fajardo testified that, on April 10, 2011, she was tending the bar at La Roka. Defendant was in the bar with two of his friends, Ascensio and Ortiz. At some point, a man entered the bar and sat alone. Defendant, Ascensio, and Ortiz did not interact with the man. Defendant, Ascensio, and Ortiz left the bar when it closed, around 1:45 a.m. Fajardo left at 2 a.m. and observed defendant, Ascensio, and Ortiz standing on the sidewalk outside the bar. She also observed drops of blood and a man, who she thought was drunk, lying on the ground. She did not think she had observed the man in La Roka that evening. No other patrons were outside La Roka at the time. Fajardo entered her vehicle to leave, at which time Ortiz knocked on the window and asked her for a ride home. Fajardo agreed and drove him to the area of 26th Street and Christiana Avenue. Fajardo spoke to detectives the next day and told them she had observed three men outside La Roka but did not give detectives their names. Fajardo did not tell detectives she had given one of the men a ride home because "they didn't ask [her]."

¶ 22    Jose Lopez testified that, on April 10, 2011, he was drinking at a friend's house with Ascensio.[2] At approximately 7:20 p.m., he and Ascensio walked to La Roka. Jose carried a bottle of beer as he walked to the bar and, when they arrived, he placed the bottle on the windowsill outside the bar. Jose left the bar at approximately 8:40 p.m. He did not observe defendant while he was at La Roka and he did not observe Ascensio argue or "have any words" with anybody before he left.

¶ 23    Officer Oscar Lopez testified that, on April 11, 2011, he and his partner, Violet Rey, were on patrol and received a call at 1:58 a.m. that "five guys [were] beating up one guy" in the 3000 block of South St. Louis Avenue. Lopez and Rey relocated to the area and observed Corral, who was bleeding, bruised, and unresponsive, lying facedown on the ground in front of 3010 South St. Louis.

¶ 24    Lopez and Rey approached defendant, who was standing on the sidewalk in front of his residence and across the street from where Corral was discovered, and asked what had happened to Corral. Defendant told the officers Corral had been beaten up by three or four men with a bottle. At that time, Lopez observed defendant's hand was swollen, cut, and bleeding. When Lopez asked defendant what happened to his hand, defendant told him that he intervened to help while Corral was being attacked by a "Pisus," which is a term for a Mexican immigrant. On cross-examination, Lopez testified defendant told him he observed three men beating Corral.

---

[2] Because the State also presented the testimony of Officer Oscar Lopez, we will refer to Jose Lopez by his first name and Officer Oscar Lopez by his last name.

¶ 25    Lopez observed a trail of blood and broken glass from La Roka to where he discovered Corral, which was "the second house from the bar." No eyewitnesses spoke to Lopez or Rey while they were at the scene.

¶ 26    Detective Adrian Garcia testified that, on April 11, 2011, he went to the 3000 block of South St. Louis. When he arrived, he observed a trail of blood between 3010 South St. Louis and La Roka bar, broken beer bottles, and a bloody shirt. After speaking with Lopez and Rey, he made contact with defendant. Defendant came out of his residence voluntarily, spoke with Garcia, and agreed to go to the police station and speak with detectives. Garcia observed cuts and swelling on defendant's right hand. Once at the station, Garcia observed minor cuts on defendant's left hand. Defendant told Garcia that he was at La Roka and observed Corral and Rios "lock eyes" and start a fight, which "went outside." Defendant told Garcia he intervened to help Corral and punched Rios in the nose.

¶ 27    Garcia then went to the 3000 block of South St. Louis and made contact with Rios in the bedroom of his apartment, which was in the front of the building and "relatively close" to where the bloody shirt lay on the ground. Rios had bruising about his body and face and cuts, which looked like they had begun to heal. Garcia was unable to "date" the bruising on Rios's face. Rios had difficulty walking and required the assistance of crutches. Garcia explained that Rios "wasn't able to move around at all" and required assistance to walk into the elevator at the station. The State introduced into evidence and published to the jury photographs of Rios, which were taken the day Garcia spoke with him.

¶ 28    Garcia also spoke with Dominguez and, after the interview, placed defendant under arrest. After defendant was arrested, he was placed in a physical lineup, which was viewed by

Dominguez. Dominguez identified defendant as the person she had observed beating, stomping, and punching Corral. In addition, Dominguez viewed a photographic array, in which she identified Ortiz as the person she had observed punching and kicking Corral. Dominguez also identified Ortiz in a physical lineup. Defendant's and Ortiz's clothing was taken and inventoried.

¶ 29    Aracelia Gonzalez testified that, in April 2011, she was Rios's girlfriend and, at the time, Rios lived at 3008 South St. Louis. At approximately 10:30 p.m. on April 10, 2011, Gonzalez went to Rios's residence. When she arrived, Gonzalez observed Rios had been beaten "pretty badly." Rios was limping and his face was bruised and swollen. Gonzalez and Rios ate dinner and watched movies. According to Gonzalez, Rios did not leave the house at any time before she left the next day at 7 a.m.

¶ 30    Detective Robert Graves testified he went to Mount Sinai Hospital on April 11, 2011, where he examined and cataloged Corral's personal belongings. No wallet was found in those belongings.

¶ 31    Detective Ryan Miller testified that, on April 11, 2011, he and Graves went to La Roka to look for "any kind of blood, broken glass, [or] any indicators that *** a fight" occurred inside the bar. Miller and Graves knocked on the door, and a man answered the side door and let the detectives inside. Miller observed the bar was clean and did not observe any broken glass or blood. Miller testified it appeared someone had cleaned the bar at the end of the night, and he did not know the condition of the bar at 1 or 2 a.m.

¶ 32    Forensic investigator Carl Brasic testified he collected, packaged, and inventoried numerous pieces of physical evidence from the area between the corner of 30th Street and South St. Louis and 3016 South St. Louis. He collected Corral's Blockbuster card and driver's license,

numerous pieces of broken beer bottles, some of which had visible bloodstains on them, and several whole beer bottles. He also collected a blood-stained and cut white T-shirt from the sidewalk in front of 3010 South St. Louis, and seven blood swabs from the crime scene, one from a glass window outside La Roka and six from the trail of blood on the ground between 3000 and 3010 South St. Louis. At the police station, on April 11, 2011, he collected defendant's clothing— a pair of white gym shoes, a black and gray jacket, blue jean shorts, a gray T-shirt, and one white sock—as well as blood swabs from the back of defendant's hands.

¶ 33    Detective Mary Nanninga testified that, on April 11, 2011, she searched defendant's residence with the consent of his mother. In defendant's bedroom, she found two pairs of jeans, a sock with a red stain, a white T-shirt with "suspect blood on it," a black T-shirt, and a pair of white socks, all of which were collected and inventoried by an evidence technician.

¶ 34    Detective Terrence Shields testified that, on April 11, 2011, he executed a search warrant at Ortiz's house, which was located in the 2600 block of South Christiana. He collected and inventoried a pair of Nike gym shoes that "had some blood spatter on it," and a pair of jeans from a bedroom which also contained a letter addressed to Ortiz.

¶ 35    Evidence technician Stephen Balcerzak testified that, on April 11, 2011, he collected and inventoried Ortiz's clothing, including a white tank top, black long-sleeve shirt, a pair of "Roca blue jeans," and Nike gym shoes. In addition, Balcerzak took a buccal swab from Rios. Evidence technician Roy Kawaski testified that, on April 13, 2011, he recovered and inventoried Ascensio's clothing, including a white T-shirt, blue jeans, white socks, and gym shoes.

¶ 36    The parties entered the following stipulations. Forensic investigator Stocker received and inventoried a blood card standard of Corral.[3] Investigator Michael Delacy took buccal swabs from defendant, Ortiz, and Ascensio for the purpose of obtaining deoxyribonucleic acid (DNA) standards for analysis.

¶ 37    Forensic scientist Wendy Gruhl was an expert in the field of forensic biology. She analyzed three pieces of broken glass recovered from the scene. She extracted blood samples from each of those pieces of glass and preserved the samples for DNA analysis.

¶ 38    Michelle Moody, an expert in the field of forensic biology, extracted blood and skin-cell samples from the following items and preserved the samples for DNA analysis: a white T-shirt recovered from defendant's bedroom, a pair of Converse gym shoes recovered from defendant, a pair of white Fila shoes recovered from Ascensio, a white T-shirt recovered from Ascensio, a pair of white Nike shoes recovered from Ortiz, and a pair of jeans recovered from Ortiz.

¶ 39    The parties also stipulated that, if called, forensic scientist Jennifer Wagenmaker would testify as an expert in the field of forensic biology. Wagenmaker examined the blood swabs taken from three pieces of broken glass found at the scene, the trail of blood between La Roka and 3010 South St. Louis, the glass window outside La Roka, and defendant's hands and preserved them for future DNA analysis. Additionally, she received the buccal swab from Rios and preserved it for future DNA analysis.

¶ 40    The parties further stipulated that, if called, forensic scientist Katrina Gomez would testify as an expert in the field of forensic DNA analysis. Gomez performed DNA analysis on various

---

[3] Stocker's first name is not identified in the record.

items and determined that the blood and skin-cell samples recovered from the white T-shirt recovered from defendant's bedroom contained defendant's DNA and not Ortiz's or Ascensio's.

¶ 41    Forensic scientist Greg Didomenic testified as an expert in the field of forensic DNA analysis. He extracted a DNA standard from the blood standard collected from Corral and determined it was suitable for comparison. From that standard, he analyzed the T-shirt collected from defendant's bedroom and determined the blood stains from the shirt did not match Corral's DNA profile. He also analyzed the blood stains found on defendant's shoes and found mixtures of DNA profiles on each shoe. The major DNA profile in the blood stain on the right shoe matched Corral and the minor DNA profile was suitable only for exclusionary purposes. Corral could not be excluded as a contributor of the DNA profiles on the left shoe.

¶ 42    The parties stipulated that forensic scientist Kenan Hasanbegovic was an expert in the field of forensic DNA analysis. Hasanbegovic analyzed the blood samples from the sidewalk between La Roka and 3010 South St. Louis and from the window at La Roka and determined the DNA profile contained in those samples matched Corral's DNA profile and did not match defendant, Ascensio, Ortiz, or Rios. Hasanbegovic also conducted DNA analysis on the blood collected from defendant's hands. The blood collected from defendant's right hand contained a mixture of two DNA profiles. The major profile on the right hand matched defendant's DNA profile. The minor profile contained a profile from which Corral could not be excluded and from which 1 in 20 black, 1 in 34 white, and 1 in 74 Hispanic unrelated individuals could not be excluded. The minor DNA profile did not match Ascensio, Ortiz, or Rios.

¶ 43    The blood collected from defendant's left hand contained a mixture of DNA from at least three people. Corral could not be excluded from the major DNA profile found in the mixture, and

approximately 1 in 400 trillion black, 1 in 25 trillion white, and 1 in 210 trillion Hispanic unrelated individuals could not be excluded from having contributed to the major DNA profile. The major profile did not match defendant, Ascensio, Ortiz, or Rios.

¶ 44    Hasanbegovic also analyzed the blood collected from defendant's shoes, Ascensio's shoes, and Ortiz's jeans and determined Rios was not a contributor to the DNA profiles found in the blood.

¶ 45    The parties stipulated that forensic scientist Michael Cox was an expert in the field of fingerprint identification. He examined beer bottles and broken pieces of beer bottles recovered from the scene and only one of those items, an empty beer bottle, contained a latent print suitable for comparison. That beer bottle contained a latent fingerprint which matched a fingerprint obtained from Jose Lopez.

¶ 46    The parties stipulated that forensic investigator Mediola Kunis examined the body of Corral during his autopsy for possible shoe impressions. She photographed two marks on Corral's head.

¶ 47    The parties stipulated that forensic scientist Aimee Stevens was an expert in the field of shoe impressions. She analyzed the photographs taken by Kunis and the white T-shirt collected from the sidewalk in front of 3010 South St. Louis. She determined the white T-shirt contained two shoe impressions and a photograph of Corral's head depicted one shoe impression. Stevens also examined the shoes recovered from defendant, Ascensio, and Ortiz and created test impressions therefrom. She then compared the test impressions to the shoe impressions on the white shirt and concluded the impressions on the white shirt were consistent with the shoes collected from defendant and were not made by the shoes collected from Ascensio and Ortiz.

However, Stevens could not identify or eliminate the impressions due to a lack of physical characteristics. Stevens also compared the test impressions with the impression found on the photograph of Corral and concluded the impression on Corral's head was consistent with the shoes collected from Ortiz and was not made by the shoes collected from defendant or Ascensio.

¶ 48    The State rested, and defendant presented two stipulations for the purpose of impeaching Ascensio and Fajardo. The parties stipulated that Ascensio told police: defendant had punched a "short bald Mexican"; he smoked a cigarette with defendant; "why are those jag-offs identifying me, I didn't do anything"; he did not know who "went through" Corral's pockets; Corral walked out of La Roka with a "short guy"; Corral punched "Shorty"; a "short guy" came from across the street when he exited the bar; and he shared only 75% of what had happened with the police and they were asking for the other 25%. The parties also stipulated that Fajardo never told detectives she had given Ortiz a ride home and she never told them "anything about observing people going back to the corner."

¶ 49    The jury found defendant guilty of first degree murder and armed robbery. Defendant filed a posttrial motion, which the trial court denied.

¶ 50    The trial court sentenced defendant to a 33-year prison term for first degree murder and a consecutive 7-year prison term for armed robbery. Defendant filed a motion to reconsider sentence, which the court denied. This appeal followed.

¶ 51    On appeal, defendant first contends he is entitled to a new trial because the State was permitted to introduce a prior consistent statement made by Dominguez. According to defendant, Dominguez's affirmative answer to the State's inquiry into whether she had "essentially told [detectives] what [she] had told" the jury at trial violated the bar against the admission of a prior

consistent statement to bolster a witness's credibility. Defendant acknowledges he forfeited this error by failing to object in the trial court and raise the issue in his posttrial motion but nevertheless asks this court to grant him relief under the plain-error doctrine. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (in order to preserve a claim for review, a defendant must both object at trial and include the error in a posttrial motion).

¶ 52    The plain-error doctrine is a narrow exception to the forfeiture rule which permits the reviewing court to excuse a party's procedural default and grant relief if a clear and obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant has the burden of persuasion under either prong of plain error. *People v. Fort*, 2017 IL 118966, ¶ 18 (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). Ordinarily, the first step in the analysis is to determine whether there was error. *People v. Wilmington*, 2013 IL 112938, ¶ 31. However, we need not make this determination where defendant is unable to meet his burden of persuasion under either prong of the analysis. *People v. White*, 2011 IL 109689, ¶ 134.

¶ 53    The admission of a prior consistent statement does not implicate a substantial right and therefore does not rise to the level of plain error under the second prong of the plain-error rule. *People v. Keene*, 169 Ill. 2d 1, 18 (1995). Defendant does not argue otherwise. Instead, he argues he is entitled to relief because the evidence was closely balanced. We do not find this argument persuasive.

¶ 54 To be entitled to relief under the closely balanced prong of the plain-error rule, "the defendant must prove 'prejudicial error.' " *Herron*, 215 Ill. 2d at 187. To do so, the defendant must establish the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *Herron*, 215 Ill. 2d at 187. Stated differently, we may consider a forfeited error where the defendant has shown the evidence was "so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." *Herron*, 215 Ill. 2d at 178. "In determining whether the closely balanced prong has been met, we must make a 'commonsense assessment' of the evidence [citation] within the context of the circumstances of the individual case." *People v. Adams*, 2012 IL 111168, ¶ 22 (citing *White*, 2011 IL 109689, ¶ 139).

¶ 55 We conclude defendant has failed to establish the evidence in this case was closely balanced. On April 11, 2011, after hearing breaking glass and "punching sounds," Dominguez looked through her apartment window and observed defendant, her neighbor whom she had known for 10 years, along with Ortiz and another man, attacking Corral. She observed Ortiz kicking Corral in the head and arms, defendant kicking Corral in the head and jumping on his chest while holding onto a fence, and the third man throwing a bottle at Corral and kicking him in the legs. After the beating stopped, she observed defendant take Corral's wallet.

¶ 56 At that time, Silva was in the attic of Tricky's residence and heard glass breaking outside. He briefly looked through a small window and observed Ascensio throw a bottle at Corral. He then moved away from the window, called 911, and left Tricky's residence before emergency personnel arrived.

¶ 57 Ascensio gave an account consistent with that of Dominguez and Silva. He left La Roka behind Corral, defendant, and Ortiz. About "halfway down the block" on South St. Louis, he

observed defendant and Ortiz punch Corral in the face, knocking him to the ground. Ortiz and defendant kicked Corral in the head, and defendant held onto a fence and repeatedly jumped onto Corral's chest. Ascensio then entered the fray, threw a bottle at Corral, and kicked his legs.

¶ 58    In addition to the eyewitness accounts, the State also presented physical evidence which established defendant's guilt and corroborated the witnesses' accounts of what transpired. Blood was found on defendant's shoes and the back of his hands, and Corral could not be excluded as a contributor to the DNA profiles found in that blood. In fact, the major DNA profile on defendant's right shoe matched Corral's DNA profile. Corral could not be excluded as a contributor to the major DNA profile found in the blood on defendant's left hand but defendant, Ascensio, Ortiz, and Rios could. Additionally, Corral could not be excluded as the contributor to the minor DNA profile found in the blood on defendant's right hand. The presence of DNA on defendant's shoes and hands from which Corral could not be excluded as a contributor corroborated (1) Dominguez's testimony that defendant kicked Corral and stomped on his chest; and (2) Ascensio's testimony that defendant punched Corral in the face, kicked him, and stomped on his chest.

¶ 59    Further, the shoe impressions found on Corral's bloody shirt were consistent with the test impression taken from defendant's shoes, though not a definitive match, and were not consistent with the test impressions taken from Ascensio's and Ortiz's shoes. This corroborated Dominguez's and Ascensio's testimony that defendant held onto a fence and stomped on Corral's chest. Additionally, the shoe impression found on Corral's head was consistent with a test impression taken from Ortiz's shoe—the same shoe on which Corral's blood was found—though not a definitive match, and was not consistent with the test impressions taken from defendant's or

Ascensio's shoes. This corroborated Dominguez's and Ascensio's testimony that Ortiz kicked Corral in the head.

¶ 60    Defendant argues a case is closely balanced where, as here, the defense has contested the State's theory of the case with a plausible opposing version of events. We reject defendant's assertion that he contested the State's theory of the case with a plausible opposing version of events. The evidence on which defendant relies to support this assertion was elicited by the State in its examinations of Lopez and Garcia, which revealed defendant gave Lopez and Garcia inconsistent statements. According to Lopez, when he asked defendant what had happened to his hand, which was cut, swollen, and bleeding, defendant stated his hand was injured when he intervened to help Corral as he was being beaten by three men with bottles and Corral "was getting beat up by a Pisus and he tried to help him out." Later, defendant's version of events evolved. He told Garcia he was at La Roka when he observed Corral and Rios "lock eyes," a fight break out inside the bar which spilled outside, and that he punched Rios in the nose to help Corral.

¶ 61    Thus, this case is distinguishable from *People v. Sebby*, 2017 IL 119445, and *People v. Naylor*, 229 Ill. 2d 584 (2008), on which defendant relies. In those cases, the defendants testified as to what transpired. Further, in *Sebby*, the defendant supported his version of events with the testimony of additional witnesses. Thus, those cases involved "credibility contests" that required the juries to resolve differing but plausible versions of events supported by witness testimony.

¶ 62    Moreover, the evidence established defendant did not intervene in an attack by three men on Corral or break up a fight between Rios and Corral. Flores and Fajardo testified no fights occurred inside the bar on the night in question as claimed by defendant. Ascensio testified Rios was not present inside the bar and did not fight with Corral as claimed by defendant. In fact,

Gonzalez testified she was with Rios from 10:30 p.m. on April 10, 2011, until she left the next day, and Dominguez testified Rios was neither present during nor involved in the fight. Rios's DNA was not found on any of the persons involved or any of the physical evidence recovered. Additionally, Garcia testified Rios's injuries did not appear fresh when he spoke with him; rather, the injuries were healing. A photograph of Rios that was taken in the morning of April 11, 2011, was admitted into evidence and published to the jury. Our review of that photograph reveals no injury to Rios's nose.

¶ 63    Not only did the evidence show Rios was not present at La Roka and he did not fight with Corral, the evidence established defendant could not have intervened in a fight between Rios and Corral because Rios was nearly incapacitated by the injuries he sustained prior to April 10, 2011. Gonzalez and Garcia both testified Rios had difficulty walking as a result of injuries he had sustained. In fact, Garcia testified police had to help Rios ambulate around the police station.

¶ 64    We likewise reject defendant's assertion that "much of the physical evidence was as consistent with his account as it was with a version of events that placed him as one of Corral's assailants." He notes his fingerprints were not found at the scene and the State's shoe impression was not definitive. Putting aside the absence of defendant's fingerprints and the shoe impression evidence, defendant fails to explain how Corral's DNA appeared in the blood on his shoes and hands. The presence of Corral's DNA on his shoes and hands is not consistent with defendant's statements to Lopez and Garcia. Rather, it is consistent with only one conclusion: that defendant punched Corral in the face and then kicked and stomped him as was established by Dominguez's and Ascensio's testimony.

¶ 65    Defendant also argues the evidence was closely balanced because the State's case rested largely on the testimony of Dominguez, whose credibility was bolstered by her testimony that she had told the police "essentially" what she told the jury. He asserts "Dominguez's credibility was otherwise in question" based on her statement to the 911 operator that five, not three, men were involved in the attack and her failure to identify defendant as one of the assailants despite the fact she had known him for years. In support of this argument, defendant cites *People v. Matthews*, 2012 IL App (1st) 102540, and *People v. Smith*, 139 Ill. App. 3d 21 (1985), and maintains that, in those cases, the evidence was found closely balanced where, as here, the State's case hinged on the testimony of a witness whose testimony was improperly bolstered by a prior consistent statement.

¶ 66    *Matthews* and *Smith* are inapposite. In *Matthews* and *Smith*, the only evidence of the defendants' guilt was the testimony of a single witness who implicated the defendants at trial and, in both cases, there was a lack of physical evidence linking the defendants to the murders. *Matthews*, 2012 IL App (1st) 102540, ¶¶ 3-9; *Smith*, 139 Ill. App. 3d at 24-25.   Further, in *Matthews*, we found the only physical evidence presented—the defendant's DNA under the fingernails of the victim and a fingerprint on an object in the victim's bedroom—had a "benign explanation" supported by expert testimony. *Matthews*, 2012 IL App (1st) 102540, ¶ 28. In this case, on the other hand, the State's evidence did not, as defendant asserts, hinge solely on the testimony of Dominguez. The State also presented the testimony of two additional eyewitnesses, one of whom fully corroborated her account and the other whose testimony was not entirely inconsistent with it. Further, as explained above, the State presented physical evidence linking

defendant to Corral's murder and robbery that did not have a benign explanation and corroborated the witnesses' accounts of what transpired.

¶ 67    Defendant also notes that Silva's account differed from Dominguez's in that Silva testified only two men were involved, one of whom was Ascensio and the other he could not identify as defendant. He argues that Dominguez's testimony was therefore crucial to the State's case because she was the person who identified defendant as one of Corral's assailants.

¶ 68    The record discloses a reasonable explanation for the inconsistency between Silva's and Dominguez's accounts and Silva's failure to identify defendant as an attacker. It is clear from Silva's testimony he looked through the window briefly when he heard glass breaking and did not observe as much of the attack as did Dominguez. The only physical act of the attack he described was Ascensio throwing a bottle, which was the last thing he saw before he called 911 and left Tricky's attic. In addition, Silva's failure to identify defendant as one of the attackers was explained by his testimony that he observed only the back of the other man who was attacking Corral. In any event, the State's evidence need not be airtight to avoid application of the plain-error rule. *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 49.

¶ 69    Further, defendant wholly discounts Ascensio's testimony, arguing his credibility was severely compromised by the fact he was an accomplice who received a substantial benefit in exchange for his trial testimony, gave police multiple accounts of what had occurred, and admitted lying to police multiple times. While Ascensio's testimony was to be viewed with caution by reason of his involvement in the attack and the sentencing concession he received as a result of testimony, his testimony was not inherently unbelievable and we must consider it in our evaluation of the evidence in this case. *People v. Belknap*, 2014 IL 117094, ¶¶ 55, 57-59. As noted above,

Ascensio's testimony regarding what transpired was corroborated by Silva, Dominguez, and the physical evidence. This corroboration lends credence to Ascensio's testimony. *Belknap*, 2014 IL 117094, ¶ 58.

¶ 70    In sum, we are not persuaded the evidence was so closely balanced such that the admission of Dominguez's testimony that she "essentially" told police what she told the jury threatened to tip the scales of justice against defendant. See *Wilmington*, 2013 IL 112938, ¶ 43 (defendant bears burden of persuasion under plain-error rule). The State presented evidence of defendant's guilt that, even if not airtight, overwhelmingly established defendant's guilt. Accordingly, defendant is not entitled to relief under the plain-error rule.

¶ 71    Defendant also contends this court should vacate his 2002 AUUW conviction pursuant to *In re N.G.*, 2018 IL 121939, asserting he was convicted under the portion of the AUUW statute which was found unconstitutional on its face in *Aguilar*, 2013 IL 112116. The State concedes defendant's 2002 AUUW conviction must be vacated. We agree with the parties and accept the State's concession.

¶ 72    In *Aguilar*, 2013 IL 112116, ¶ 22, the supreme court held that section 24-1.6(a)(1), (a)(3)(A), (d) of the Criminal Code of 1961 (Code) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2002)), was unconstitutional on its face. In *In re N.G.*, 2018 IL 121939, ¶ 42, the supreme court held courts have an affirmative duty to invalidate unconstitutional AUUW convictions even when the conviction was not rendered in the case before it. The court explained, where a person has been convicted under an unconstitutional statute, he or she may obtain relief provided the person "raises his or her challenge through an appropriate pleading in a court possessing jurisdiction over the parties and the case." *In re N.G.*, 2018 IL 121939, ¶¶ 56-57.

¶ 73    Defendant, pursuant to a stipulation with the State, has supplemented the record on appeal to include the charging instrument and sentencing order in Cook County case No. 02 CR 26696. The sentencing order establishes that defendant was sentenced to 12 months' probation for AUUW under section 24-1.6(a)(1), (a)(3)(A), (d) of the Code, which was invalidated in *Aguilar*. Thus, defendant's 2002 AUUW conviction was void *ab initio* and we have an affirmative duty to vacate it. *In re N.G.*, 2018 IL 121939, ¶ 42. Accordingly, we accept the State's concession and order that defendant's conviction for AUUW in case No. 02 CR 26696 be vacated.

¶ 74    For the reasons stated, we affirm the trial court's judgment. In addition, we vacate defendant's conviction for AUUW in Cook County case No. 02 CR 26696.

¶ 75    Affirmed in part and vacated in part.